STATE OF NEW JERSEY, DEPART-
MENT OF EDUCATION, Petitioner
in No. 80–1991,

v.

Shirley HUFSTEDLER, Secretary of Edu-
cation, United States Department of Ed-
ucation, Respondent in No. 80–1991.

COMMONWEALTH OF PENNSYLVA-
NIA, Petitioner in No. 80–2302,

v.

SECRETARY OF EDUCATION, UNITED
STATES DEPARTMENT OF EDUCA-
TION, Respondent in No. 80–2302.

Nos. 80–1991, 80–2302.

United States Court of Appeals,
Third Circuit.

Argued May 18, 1981.

Decided Oct. 13, 1981.

Rehearing and Rehearing In Banc

Denied Dec. 17, 1981.

John J. Degnan, Atty. Gen., Erminie L. Conley, Asst. Atty. Gen., M. Kathleen Duncan, Mary Ann Burgess, Deputy Attys. Gen. (argued), Trenton, N. J., for State of New Jersey, Dept. of Ed.

Margaret Hunting, Deputy Atty. Gen. (argued), Emogene L. Trexel, Asst. Atty. Gen., Dept. of Justice, Harrisburg, Pa., for Commonwealth of Pennsylvania.

Robert J. Arnot (argued), Stephen H. Freid, Philip H. Rosenfelt, U. S. Dept. of Ed., Washington, D. C., for United States Dept. of Ed.

Before ADAMS, ROSENN, and HIGGINBOTHAM, Circuit Judges.

## OPINION OF THE COURT
ROSENN, Circuit Judge.

These petitions for review of final decisions of the United States Department of Education ("Department" or "Agency")[1] present important questions of first impression in this court. The decisions under review are orders directing petitioners New Jersey and Pennsylvania ("States") to refund to the Department federal funds distributed to the States under the provisions of Title I of the Elementary and Secondary Education Act of 1965 as amended[2] ("ESEA") and determined by the Agency audits to have been misapplied under the terms of that Act and its implementing rules and regulations.[3] The States have refused to comply with the Department's directives because they contend that the Agency is without authority under the Act to recover through administrative proceedings Title I funds that were misspent during the years in question.[4] Additionally, New Jersey challenges the correctness of the Agency's audit findings; Pennsylvania challenges the Department's interpretation and application of the Act's statute of limitations and claims that its rulemaking procedures are deficient. We reach only the question of the Agency's claimed authority to issue the orders presently before us and

1. The Department of Education was created by the Department of Education Organization Act, Pub.L.No.96–88, 93 Stat. 668 (1979) (codified at 20 U.S.C. §§ 3401–3508 (Supp. III 1979)) and is the successor agency to the former Office of Education ("OE") in the Department of Health, Education and Welfare ("HEW"). The transfer of functions authorized by the act occurred on May 4, 1980, at the direction of the President. Exec.Order No. 12,212, 3 C.F.R. 255 (1981), *reprinted in* [1980] U.S.Code Cong. & Ad.News 7826. Only the very last stages of the administrative proceedings in the cases before us took place after the transfer of functions. However, for purposes of clarity, the former designations of "Office of Education" and "Commissioner of Education" will be used in this opinion only when precision is necessary, otherwise being subsumed in the references to the "Department of Education" and the "Secretary of Education."

2. Pub.L.No.89–10, 79 Stat. 27, *amended by* Pub.L.No.89–750, 80 Stat. 1191 (1966); Pub.L. No.90–247, 81 Stat. 783 (1967); Pub.L.No.91–230, 84 Stat. 121 (1969, *enacted* 1970); Pub.L. No.92–318, 86 Stat. 235 (1972); Pub.L.No.93–380, 88 Stat. 484 (1974); Pub.L.No.94–482, 90 Stat. 2081 (1976); Pub.L.No.95–112, 91 Stat. 911 (1977); Pub.L.No.95–561, 92 Stat. 2143 (1978); *and* Pub.L.No.96–46, 93 Stat. 338

(1979). The various pieces of amending legislation will be referred to by the date contained in their short titles—*e. g.*, 1969 Amendments. Footnote references to public law number and session law citation will be provided as appropriate.

3. 45 C.F.R. pts. 116 & 116a (1980) (to be transferred to 34 C.F.R. pts. 200 & 201 (1981)). In addition to these codified regulations the Agency implements the Act in several less formal manners. For example, the Agency has established mandatory criteria in its program guidelines, which are distributed to nonfederal agencies preparing applications for participation in Title I. The Agency also distributes program manuals to participating entities and will often issue letter memoranda in response to inquiries of local or state educational agencies. *See generally* The National Institute of Education, DHEW, *Administration of Compensatory Education* 5–7 (Report to Congress 1977).

4. New Jersey's Title I program was audited for the period September 1, 1970 through August 31, 1973. The Department's assessment against Pennsylvania stems from an audit report of that state's program from July 1, 1967 through June 30, 1973.

conclude that such authority does not exist. We therefore reverse.

## I.

In 1965, as his education program was nearing floor debate in the Senate, President Johnson, commenting on the bill that was to become the Elementary and Secondary Education Act of 1965, said: "This bill has a simple purpose: To improve the education of young Americans."[5] Beginning with the ESEA, legislation passed in pursuit of that laudable objective fundamentally altered the federal government's remote role in education. The Senate committee report on ESEA notes this change in direction by quoting Senator Taft's statement expressing Congressional concerns prompting the legislation:

"Education is primarily a State function, but in the field of education, as in the fields of health, relief, and medical care, the Federal Government has a secondary obligation to see that there is a basic floor under those essential services for all adults and children in the United States."

S.Rep.No.146, 89th Cong., 1st Sess., *reprinted in* [1965] U.S.Code Cong. & Ad.News 1450. According to educational statistics then before the Congress, the nation had almost fallen below the "basic floor" referred to by Senator Taft and this encouraged federal intervention.[6]

Without doubt, the provisions of ESEA Title I effectuated one of the most ambitious federal forays into the educational domain. Confronted with overwhelming evidence of a direct link between economic privation and educational underachievement, Congress authorized a massive[7] infusion of federal funds into the nation's public school systems for the improvement of the educational lot of children from low-income families. In Title I, however, Congress has done more than simply "throw money at a problem." The statutory scheme has been carefully constructed to ensure that the funds appropriated for the benefit of disadvantaged schoolchildren are actually applied and distributed in the most equitable and efficient manner.

For example, the amount of a grant to a particular local educational agency ("LEA") is determined by direct reference to the number of children from low-income families eligible to attend the schools served by the LEA. Pub.L.No.874, tit. II, § 203, *as added by* Pub.L.No.89–10, tit. I, § 2, 79 Stat. 27, 28 (1965) (*codified as amended at* 20 U.S.C. § 2711 (Supp.III 1979)). Federal funds are to be distributed only after the state educational agency ("SEA") to which the particular LEA is responsible has provided assurances that the LEA, under the SEA's direction, will expend the federal monies only on "programs and projects . . . (A) which are designed to meet the special educational needs of educationally deprived children in school attendance areas having high concentrations of children from low-income families and (B) which are of sufficient size, scope, and quality to give reasonable promise of substantial progress toward

---

5. S.Rep.No.146, 89th Cong., 1st Sess., *reprinted in* [1965] U.S.Code Cong. & Ad.News 1446, 1448.

6. According to the Senate report,
The purpose of this legislation is to meet a national problem. This national problem is reflected in draft rejection rates because of basic educational deficiencies. It is evidenced by the employment and manpower retraining problems aggravated by the fact that there are over 8 million adults who have completed less than 5 years of school. It is seen in the 20-percent unemployment rates of our 18- to 24-year-olds. It is voiced by our institutions of higher learning and our vocational and technical educators who have the task of building on elementary and secondary

education foundations which are of varying quality and adequacy.
S.Rep.No.146, 89th Cong., 1st Sess., *reprinted in* [1965] U.S.Code Cong. & Ad.News 1449.

7. In Title I's first year, Congress appropriated $775,000,000 to the program. Departments of Labor, and Health, Education, and Welfare Supplemental Appropriation Act, 1966, Pub.L. No.89–199, ch. II, 79 Stat. 831, 832 (1965). By 1979, funding levels had reached $3,077,132,-000. Departments of Labor and Health, Education, and Welfare Appropriations Act, 1979, Pub.L.No.95–480, tit. II, 92 Stat. 1567, 1577 (1978).

meeting those needs . . . ." Pub.L.No.874, tit. II, § 205, *as added by* Pub.L.No.89–10, tit. I, § 2, 79 Stat. 27, 30 (1965) (*codified as amended at* 20 U.S.C. § 2734 (Supp.III 1979)).

The federal program prohibits the use of the funds to supplant an existing state-funded compensatory education program, requires LEA's to maintain their existing commitment in the area as a condition to continued eligibility, and prescribes that only the excess costs incurred as a result of instituting Title I programs shall be paid with Title I funds. 20 U.S.C. § 2736 (Supp.III 1979). The Act also establishes very definite criteria to be used in identifying the schools and attendance areas in which Title I funds may be expended, 20 U.S.C. § 2732 (Supp.III 1979), as well as the children that may be served. 20 U.S.C. § 2733 (Supp. III 1979). As might be expected, the specificity and complexity of the statutory restrictions on the use of Title I funds are modest when compared with the intricate set of rules and regulations adopted by the administering federal agency. *See* 45 C.F.R. pts. 116 & 116a (1980) *and* note 3 *supra.*

Although this overview of the program might suggest a rigid and pervasive federal presence at all levels of Title I administration, in keeping with traditional governmental roles in education, Congress actually entrusted most of the responsibility for management to the SEA's and the primary responsibility for innovative program development to the LEA's. Basically, the Act contemplates that each LEA that desires to receive Title I funds will file an application detailing its needs, its eligibility, and the intended uses for the requested funds. This application is submitted to the SEA, which verifies its accuracy and ensures that all proposals conform with current Title I guidelines. The SEA after collecting all LEA applications from its jurisdiction, then submits its own application to the Department for the aggregate sum to which its LEA's are eligible (according to their applications), plus an amount for administration expenses. This application is accompanied by assurances from the SEA that the funds will be used only for lawful Title I purposes.

The resolution of the questions presented by this case therefore is of considerable importance in administering the Title I program. Congress chose to rely heavily on the states to assure proper application of Title I funds, but committed to the Department the authority to adopt such rules and regulations as it deemed appropriate. Such a division of responsibility must inevitably lead to conflicts between the SEA's and the Department over the proper application of Title I funds. When conflicts have developed, the Department has resorted to a variety of procedures, all directly related to its power over the purse strings, to enforce its interpretation of the Act against the states. Some, such as withholding funds or refusing to approve applications, find their roots in the clear and unambiguous terms of the statute in effect when the deposited funds were received. Pub.L.No.874, tit. II, §§ 206, 210, *as added by* Pub.L.No.89–10, tit. I, § 2, 79 Stat. 31, 33 (1965) (*codified as amended at* 20 U.S.C. §§ 2832, 2836 (Supp. III 1979)). In this case, however, the Department adopted procedures for the Pennsylvania and New Jersey audit proceedings not clearly authorized by the statute under which the funds were disbursed. It is this variance in procedure that is the genesis of this litigation.

## A.

To understand fully the issue we decide today, a brief examination of the administrative proceedings that have brought these cases to us is necessary. The Department, in carrying out its statutory responsibilities, performed separate audits of the Pennsylvania and New Jersey Title I programs. The initial audits were performed by auditors employed by the Department of Health, Education and Welfare Audit Agency ("HEWAA"). In its final audit reports, issued in April (Pennsylvania) and June (New Jersey) of 1975, HEWAA found that both States had misapplied substantial sums of federal Title I monies during the

periods under investigation. These reports were forwarded to the Deputy Commissioner for Elementary and Secondary Education, who solicited responses from the States. On May 18, 1976, the Deputy Commissioner issued a final audit determination letter on the Pennsylvania audit. In his letter addressed to the SEA, the Deputy Commissioner sustained the audit findings that $1,346,399.00 had been misspent in Pennsylvania during the audit period and ordered the State to refund that sum to the Department. He sent a similar final audit determination letter to the New Jersey SEA on June 11, 1976, and demanded a refund of $1,161,917.00.

Upon receipt of the Deputy Commissioner's final audit determination letters, both States filed applications for review with the Title I Audit Hearing Board.[8] Panels of that Board held hearings[9] on the States' objections and, in written decisions dated February 19, 1980 (New Jersey) and May 7, 1980 (Pennsylvania), modified the Deputy Commissioner's findings and assessed audit deficiencies of $1,031,304[10] against New Jersey and of $422,424.29[11] against Penn-

sylvania. The Board's decisions were subject to a comment period during which they were forwarded to the Secretary, who declined to review them. The Board's decision as to New Jersey became the final decision of the Department on May 2, 1980; the decision as to Pennsylvania became final on July 16, 1980. Timely petitions for review were filed in this court.[12]

As explained earlier, both Pennsylvania and New Jersey contend that, to the extent the above-described procedures directed the payment of a refund by the SEA's, the procedures were outside the Department's statutory authority. The Department responds by citing two statutory provisions that it urges explicitly authorize the procedures followed in these cases. Alternatively, the Department relies on a common-law right of the Government to recoup grant funds expended in violation of the terms and conditions of the grant. We turn first to the statute.

### B.

■ The Government's dilemma lies not in the unreasonableness of its demands for

---

**8.** The Department's briefs to this court explain that "[a]lthough under no legal requirement to do so, OE created the Board to give [SEA's] a fair opportunity to rebut adverse final audit determinations of the Deputy Commissioner before an independent administrative tribunal."

**9.** On June 29, 1979, the Education Appeal Board ("EAB" or "Board"), created by Pub.L.No.95–561, tit. XII, § 451, 92 Stat. 2347 (1978) (codified at 20 U.S.C. § 1234 (Supp. III 1979)) assumed jurisdiction of all cases then pending before the Title I Audit Hearing Board. 44 Fed.Reg. 43807 (July 26, 1979). However, the transfer of functions caused few practical disruptions because the composition of the EAB was identical to that of the Title I Audit Hearing Board. Pennsylvania, however, claims to have suffered from the transfer because the notice of the establishment of the EAB, given May 25, 1979, 44 Fed.Reg. 30528, which included rules governing procedures before the EAB, indicated that the procedures were in effect immediately. Thus, Pennsylvania claims, and the Department does not deny, that the State was forced to try the portion of its case heard after May 25, 1979, under new and unfamiliar rules. Pennsylvania also asserts that the Department's final regulations governing the EAB, substantially identical to the interim final regulations under which post-May 25 hearings

were held, were disapproved by Congress pursuant to 20 U.S.C. § 1232(d) (1976 & Supp. III 1979).

**10.** This reduction resulted from the application of a five-year statute of limitations enacted in 1974. Pub.L.No.93–380, tit. I, § 106, 88 Stat. 484, 512, originally codified at 20 U.S.C. § 884 (1976), renumbered and replaced, Pub.L.No.95–561, §§ 801(2), 901(b), 93 Stat. 2284, 2305 (1978), as amended by Pub.L.No.96–46, §§ [1](20), 2(a)(3), 93 Stat. 339–40 (1979). Cf. Pub.L.No.90–247, tit. IV, § 452(g), as added by Pub.L.No.95–561, § 1232, 92 Stat. 2347–49 (1978) (prescribing a five-year statute of limitations for refund proceedings effected under the General Education Provisions Act).

**11.** This reduction resulted from an application of the statute of limitations, see note 10 supra, and from a determination that funds had not been misspent in one of the five LEAs that were the subject of HEWAA audit deficiencies.

**12.** Jurisdiction of this court is proper under either 20 U.S.C. § 2851 (Supp. III 1979) (authorizing appeals from adverse final action of the Secretary regarding Title I audits) or 20 U.S.C. § 1234d (Supp. III 1979) (authorizing appeals from adverse final action of the EAB).

the return of the misspent monies but in the absence of a statutory remedy to compel repayment. The Department first invokes a recent addition to the statutory scheme as authority for its actions in these cases. Title I's section 185 (20 U.S.C. § 2835 (Supp. III 1979)) was added by the 1978 Amendments,[13] which effectively rewrote the entire Act. Section 185 directs that when Title I audits disclose a misapplication of grant funds, the Secretary shall take steps to "assure timely and appropriate resolution of audit findings and recommendations." This audit resolution process is expressly directed to include repayment of funds "finally determined . . . to have been misspent or misapplied." Pointing out that Section 185, and complementary sections contained in the General Education Provisions Act ("GEPA"),[14] were in effect when final agency action was taken in the cases at bar, the Department claims that the decisions under review simply fulfill the statutory obligations of the Agency to ensure the fiscal integrity of Title I at the state and local level.

The States counter the Department's section 185 argument by invoking the general rule against retroactive application of statutory enactments:

"[T]he first rule of construction is that legislation must be considered as addressed to the future, not the past . . . [and] a retrospective operation will not be given to a statute which interferes with antecedent rights . . . unless such be 'the

unequivocal and inflexible import of the terms, and the manifest intention of the legislature.' "

*Greene v. United States,* 376 U.S. 149, 160, 84 S.Ct. 615, 621, 11 L.Ed.2d 576 (1964) (quoting *Union Pacific Railroad v. Laramie Stock Yards Co.,* 231 U.S. 190, 199, 34 S.Ct. 101, 102, 58 L.Ed. 179 (1913)). *See United States v. Richardson,* 512 F.2d 105, 106 (3d Cir. 1975).

The States further assert that retroactive enforcement of a newly created governmental right of recovery is especially inappropriate in the context of participatory grant programs involving sovereign states. It is, the States contend, in the nature of a grant program that a prospective grantee may exercise its prerogative not to participate. However, it is argued, for that prerogative to be exercised knowledgeably and, presumably in the case of governmental entities, in the public interest, it is necessary that the prospective grantee be able to assess the potential risks and benefits that would flow from participation. For this court, it is urged, to enforce retroactively a sanction not mentioned when the grantees entered into the program, would impose serious hardship on states operating under budgetary limitations and would result in a dramatic and undesirable reduction in the participation rates for worthy federal grant programs such as Title I.

The States' arguments are persuasive and in harmony with the views recently ex-

**13.** Pub.L.No.95–561, tit. I, § 101, 92 Stat. 2143, 2190 (1978), *adding* Pub.L.No.89–10, tit. I, § 185. The section reads:

§ 2835. Audits and audit resolution

(a) Auditing.—The Inspector General of the Department of Health, Education and Welfare shall make provision for audits of grants made under this subchapter to determine, at a minimum, the fiscal integrity of grant or subgrant financial transactions and reports, and the compliance with applicable statutes, regulations, and the terms and conditions of the grant or subgrant.

(b) Audit resolution and repayment.—The Commissioner shall adopt procedures to assure timely and appropriate resolution of audit findings and recommendations arising out of audits provided for in subsection (a) of this section. Such procedures shall include time-

tables for each step of the audit resolution process and an audit appeals process. Where, under such procedures, the audit resolution process requires the repayment of Federal funds which were misspent or misapplied, the Commissioner shall require the repayment of the amount of funds under this subchapter which have been finally determined through the audit resolution process to have been misspent or misapplied. Such repayment may be made from funds derived from non-Federal sources or from Federal funds no accountability for which is required to the Federal Government. Such repayments may be made in either a single payment or in installment payments over a period not to exceed three years.

**14.** *See* 20 U.S.C. § 1234, 1234a (Supp. III 1979).

pressed by the Supreme Court in *Pennhurst State School & Hospital v. Halderman,* 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981). In *Pennhurst,* the Court reversed this court's holding that the Developmentally Disabled Assistance and Bill of Rights Act, 42 U.S.C. §§ 6000–81 (1976 & Supp. III 1979) ("DDA"), imposed affirmative obligations on the states to provide mentally retarded persons with appropriate treatment in the environment that would be least restrictive of their personal liberty. *Halderman v. Pennhurst State School & Hospital,* 612 F.2d 84, 94, 107 (3d Cir. 1979) (*en banc*). Referring to congressional authority to legislate pursuant to the Spending Power,[15] the Court stated: "[O]ur cases have long recognized that Congress may fix the terms on which it shall disburse federal money to the States." 451 U.S. at 17, 101 S.Ct. at 1539. The *Pennhurst* Court then proceeded to describe Spending Power legislation as

> much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions. The legitimacy of Congress' power to legislate under the Spending Power thus rests on whether the State voluntarily and knowingly accepts the terms of the "contract." . . . There can, of course, be no knowing acceptance if a state is unaware of the condition . . . . [I]f Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously . . . . By insisting that Congress speak with a clear voice, we enable the States to exercise their choice knowingly, cognizant of the consequences of their participation.

*Id.*

We recognize that *Pennhurst* is not directly applicable to the cases before us. That case concerned the imposition of affirmative obligations, the costs of which were not fully covered by grant funds.

Nevertheless, the overarching principle of *Pennhurst*—that the terms and conditions of a federal grant must be set forth clearly and unambiguously in the statute authorizing the grant—precludes us from giving retroactive effect to a statute passed five years after the last disputed funds were received. Such a result would require repayment of misspent funds out of a state's general treasury. Section 185 does not confer authority on the Department to impose the sanctions it adopted in these cases.

■ The Department also relies on section 415 of the General Education Provisions Act ("GEPA"),[16] currently codified at 20 U.S.C. § 1226a–1 (Supp. III 1979), for authority to recoup misspent Title I funds. That section provides:

> Payments pursuant to grants or contracts under any applicable program may be made in installments, and in advance or by way of reimbursement with necessary adjustments on account of overpayments or underpayments as the Commissioner may determine.

We are at somewhat of a loss to understand the Department's arguments concerning the operative effect of section 415. The section is entitled "Payments" and purports to prescribe the manner in which federal funds are paid *to the states.* Therefore, it is clear that whatever "adjustments" are authorized under this provision, they are to be accomplished by means of an offset against current or prospective grant fund disbursements to SEA's. The Department's actions in the cases at bar are very much different and it cannot, therefore, invoke the authority of section 415.

In fairness to the Department, it should be noted that its arguments respecting section 415 rely heavily on certain statements in the Senate Report on the 1969 Amendments (which first enacted GEPA section

---

15. The Spending Power is derived from Congress' authority to provide for the general welfare. U.S.Const. art. I, § 8, cl. 1. Department counsel agreed at oral argument that Title I was enacted in exercise of this power.

16. Pub.L.No.90–247, tit. IV, § 425, *as added by* Pub.L.No.91–230, tit. IV, § 401(a)(10), 84 Stat. 170 (1970), *renumbered,* Pub.L.No.92–318, tit. III, § 301(a)(1), 86 Stat. 326 (1972), *renumbered* Pub.L.No.95–561, tit. XII, § 1231(a)(1), 92 Stat. 2342 (1978).

415 as section 425), which seem to indicate a much broader remedial power than we have recognized. *See* S.Rep.No.91–634, 91st Cong., 2d Sess. 83–84, *reprinted at* [1970] U.S.Code Cong. & Ad.News, 2768, 2826.[17] A close reading of the report, however, reveals that the language on which the Department relies, printed under a heading of "REPORTS AND AUDITS," was in fact explanatory of section 424 of the bill, and that the reference to section 425 was a typographical error. The committee's remarks concerning section 425 (now section 415) are in the immediately preceding paragraph of the report.[18]

Section 424, to which the legislative history quoted in note 17 in fact refers, required grant recipients to maintain appropriate records of Title I expenditures and programs and gave Department officials and members of the Comptroller General's staff full access to those records "for the purpose of audit and examination." Although not pressed upon the court, we assume the argument that section 424, in providing the authority to conduct audits, also authorizes the resolution of audit determinations and that the strong legislative history of the section indicates an intent to utilize refunds as a means of resolution. Such an argument is not unreasonable; in the circumstances of this statutory scheme, however, it is unavailable.

As we alluded to earlier, Title I was a fundamental departure from the traditional federal role in education. Public Law 874, which served as the foundation on which the 1965 ESEA was built, limited federal aid to areas directly affected by local federal activity, especially that activity related to the war effort. *See* S.Rep.No.2458, 81st Cong., 2d Sess., *reprinted in* [1950] U.S.Code Cong. & Ad.News 4014. We think it likely, in light of the historic underpinnings and the experimental nature of Title I, that Congress desired to receive accurate and reliable information on the program's strengths and weaknesses. That such information was earnestly sought and utilized is reflected by the number and breadth of the ESEA amendments. *See* note 2 *supra.* Despite the committee's acknowledgment that audit reports had been forthcoming in the past, we believe that section 424 was enacted as a means of assuring the continued flow of information to the Department and Congress.

We find support for our conclusion in the 1978 Amendments to the Act which, although they augmented the Act with section 185 and its GEPA counterpart section 452,[19] both of which explicitly authorize the Secretary to demand and collect refunds of misspent monies, left in place section 424 (*codified as amended at* 20 U.S.C. § 1232f (Supp. III 1979)), without significant amendment. Were we to read section 424 as authorizing the procedures used and the orders issued in the instant cases, not only would we be ascribing to Congress a useless act in enacting section 185, but we would be construing the Act to contain plain redundancies. Neither course is appropriate.

**17.** The Department quoted to the court the following passage from the report:
The language of section 425 is based on a recommendation of the Comptroller General respecting retention of records and audits relating to education programs.
Audit reports on title I of the Elementary and Secondary Act have been valuable to the committee in its review of that program. The committee notes that exceptions have been taken to certain expenditures of title I during the initial years of the program and, to the extent this committee has reviewed those exceptions, they appear to be well founded. Even though there may be difficulties arising from recovery of improperly used funds, those exceptions must be enforced if the Congress is to carry out its responsibility to the taxpayer.

**18.** That paragraph reads:
GENERAL PROVISIONS
Sections 422, 423, and 425 are general provisions concerning the prohibition of Federal control of education, labor standards, and methods of payment. These three sections are a substitute for the numerous similar provisions scattered throughout present law and obviate the necessity of including similar provisions in any further legislation.

**19.** Pub.L.No.90–247, tit. IV, § 452, *as added by* Pub.L.No.95–561, tit. XII, § 1232, 92 Stat. 2347 (1978) (*codified at* 20 U.S.C. § 1234a (Supp. III 1979)).

The Department has been very thorough in marshalling its arguments before this court. Barely a line of legislative history supporting the existence of recoupment authority during the time these funds were received has escaped attention in its oral argument or brief. The States also have made extensive efforts to support their position in the reports and discussion of congressional committees and members. The parties' assiduousness, however, has failed to provide the requisite legislative history which compels either interpretation of the statute. In view of this void, we look to the terms of the statute itself for that clarity of expression demanded of Congress when states are asked to put at risk substantial rights and benefits in exchange for their participation in a federal grant program. We have studied this statute carefully; we have also closely reviewed the Department's regulations. We cannot say with the necessary firmness of belief that prior to 1978 Congress conferred upon the Department the authority it here asserts against the States. We are constrained, therefore, to deny the statutory power of the Agency to order repayment of the misspent or misapplied funds.

## C.

■ As an alternative source of authority, the Department invokes the common-law right of the Government to recover money and property distributed contrary to law or under a mistake of fact. *See Rex Trailer Co. v. United States*, 350 U.S. 148, 151, 76 S.Ct. 219, 221, 100 L.Ed. 149 (1956); *United States v. Munsey Trust Co.*, 332 U.S. 234, 239–40, 67 S.Ct. 1599, 1601–1602, 91 L.Ed. 2022 (1947); *Wisconsin Central Railroad v. United States*, 164 U.S. 190, 206, 211, 17 S.Ct. 45, 51, 41 L.Ed. 399 (1896). Arguing that federal agencies are free—perhaps obligated—to avail themselves of this remedy to recover misspent funds, the Department cites to *United States v. Marion County School District*, 625 F.2d 607 (5th Cir. 1980); *Mount Sinai Hospital v. Weinberger*, 517 F.2d 329 (5th Cir. 1975); and *Utah*

*State Board of Vocational Education v. United States*, 287 F.2d 713 (10th Cir. 1961).

Although not willing to concede that a common-law right of recovery exists in the circumstances of these cases, the States argue that even assuming the Department could pursue such a remedy for Title I violations, it would have to do so by instituting an appropriate action in a court of competent jurisdiction. Because all proceedings leading up to the decisions presently under review were conducted at the administrative level, the States contend that those decisions, insofar as they require a refund of misspent monies, are a nullity. In support of their arguments, they cite *School Board v. Department of Health, Education & Welfare*, 525 F.2d 900 (5th Cir. 1976).

As evidenced by the citation of authority *supra* at 215–16, there can be no debate concerning the right of the Government "to make contracts and hold and dispose of property, and, for the protection of its property rights, . . . resort to the same remedies as a private person." *Rex Trailer Co. v. United States*, 350 U.S. at 151, 76 S.Ct. at 221. However, where a legislative body provides for liability coupled with a special statutory remedy, "that remedy, and that alone, must be employed." *Pollard v. Bailey*, 87 U.S. (20 Wall.) 520, 527, 22 L.Ed. 376 (1874). *See also National Railroad Passenger Corp. v. National Association of Railroad Passengers*, 414 U.S. 453, 458, 94 S.Ct. 690, 693, 38 L.Ed.2d 646 (1974) ("A frequently stated principle of statutory construction is that when legislation expressly provides a particular remedy . . ., courts should not expand the coverage of the statute to subsume other remedies."). The States have presented a strong argument that by providing for the withholding of funds and disapproval of SEA applications, Congress intended to abrogate whatever common-law causes of action the Department may have had to redress noncompliance with the federal Title I scheme. The Department makes an at least equally persuasive argument, grounded in legislative

history[20] and an analysis of the operation of the statutory remedies[21] that Congress did not intend that the Department be without a remedy to recover misspent funds. Therefore, it is argued, if the statute does not provide such authority, Congress must have intended to leave the common-law remedies intact. In the circumstances of these cases, we need not now decide whether a common-law right of recovery survived enactment of the ESEA because if such a remedy does exist, the method of distributing Title I monies lends itself to enforcement of that right only by an action in a court of competent jurisdiction.

Of the cases relied on by the Department, only *Mount Sinai Hospital v. Weinberger*, 517 F.2d 329 (5th Cir. 1975) involved a wholly administrative utilization of a common-law right of recovery. In *Mount Sinai*, HEW withheld funds owing to the hospital for past services rendered to Medicare patients. HEW's action was prompted by the Agency's determination that, on other occasions in the past, the hospital had rendered services that were not medically necessary but had nevertheless been paid for with Medicare funds. The hospital brought court action seeking an injunction directing the Agency to release the funds and to pay them over to the hospital. The district court granted the injunction, holding that HEW's common-law right of recoupment had been abrogated by enactment of the comprehensive Medicare statute. The Fifth Circuit reversed on the abrogation issue.

The remedy of setoff which HEW sought to employ in *Mount Sinai*, however, is inappropriate in these cases because of fundamental differences between the funding scheme employed by HEW in *Mount Sinai* and the scheme under Title I. Medicare funds are distributed to participating health care providers by way of reimbursement for services already rendered. Thus, if HHS (formerly HEW) utilizes its common-law right of setoff, which is available to anyone holding funds owing to another from whom a debt is owing, Medicare beneficiaries still receive treatment, but the Government need not pay for those services outside the program's coverage. The same remedy was used in *Wisconsin Central Railroad v. United States*, 164 U.S. 190, 17 S.Ct. 45, 41 L.Ed. 399 (1896), dealing with recovery of illegally disbursed payments for mail carriage by a land grant railroad, and *United States v. Munsey Trust Co.*, 332 U.S. 234, 67 S.Ct. 1599, 91 L.Ed. 2022 (1947), concerning the offset of "cover costs" resulting from the breach of a government construction contract against an amount owing the defaulting contractor from the completion of other contracts.[22] In contrast, the Department uses an advance-funding method of distributing Title I funds, presumably because school districts are unable to function on an anticipated revenues basis. For the Department to attempt to use an offset remedy, therefore, would result in the failure of the school districts to provide Title I services during the year for which funding was withheld. This is obviously unsatisfactory as it defeats congressional objectives and it means that the intended beneficiaries of the Act—underprivileged schoolchildren—not only suffer when the funds are misapplied but also when the Department attempts to remedy the misapplication.

The Department has not referred us to any case in which a governmental right of recovery was administratively exercised by a means other than setoff and sustained by courts that had analyzed the issue.[23] We

**20.** The Department especially relies on the enactment, in 1974, of a statute of limitations for recovery of misspent funds. *See* note 10 *supra*.

**21.** Withholding and disapproval of applications, it is contended, are effective only to correct current violations of Title I. Once the SEA brings its program into compliance, the withholding must terminate and the application must be approved. Without the availability of a common-law right of recovery, the Agency

argues, it is powerless to correct past violations of Title I.

**22.** *See also Lodge 2424, Int'l Ass'n of Mach. & Aerospace Workers v. United States*, 564 F.2d 66 (Ct.Cl.1977).

**23.** The Department's reference to *West Virginia v. Commissioner of Education*, No. 79–1338 (4th Cir. 1980) (unpublished per curiam) is not helpful, even though that case dealt with an

have found only one such case, *Admiral-Merchants Motor Freight, Inc. v. United States*, 321 F.Supp. 353 (D.Colo.1971), and the peculiar facts of that case, coupled with the court's use of equitable estoppel, *id.* at 359, render the case inapposite to the one at bar. Further, the law announced in the case militates strongly against upholding the Department: "[A] legislative tribunal cannot exercise common law or equity jurisdiction unless this authority is expressly granted by the Congress." *Id.* at 359. *See also School District v. Department of Health, Education & Welfare*, 525 F.2d 900 (5th Cir. 1976) (HEW hearing examiner had authority only to determine eligibility of grant recipient, not to order refund of funds dispersed to ineligible grantees).

In the absence of any authority to the contrary, we conclude that the Department, if it retains a common-law right to recover misspent Title I funds, may exercise that right only by maintaining a civil action in a court of competent jurisdiction. We note that such a rule assures that the parties to the audit are able to press their arguments concerning the merits of the audit in a judicial forum, either in the Agency-initiated proceedings or in an action seeking to have the Agency remit withheld funds. The Department itself argues to this court that such an opportunity was unavailable to audited parties prior to enactment of the 1978 Amendments. Because neither of the allowable courses were followed in these cases, we may not sustain the orders directing the States to repay the funds determined to have been misspent.

## II.

Our decision in these troublesome cases is reached only after carefully weighing the effect it may have upon a valuable national educational program. Title I is an important cornerstone in the federal aid to education program and, by most accounts, it is proving reasonably successful in securing the advantages of education for the seriously disadvantaged. Misapplication of funds, even though it occurs in a good-faith effort to comply with complex regulatory requirements, detracts from the effectiveness of the program as a whole. It cannot be condoned or dismissed lightly. Administrative agencies, however, are purely creatures of statute, and their authority is statutorily circumscribed. To allow an agency to assume powers that it considers appropriate in carrying out its duties but which have not been allotted to it by Congress would attribute legislative powers to the executive branch and disturb the balance in our tripartite system of government. More important, perhaps, would be the absence of due process in a system where agencies charged with administering the multitude of federal grant programs were free to augment or abridge the rights and obligations forming the contractual basis of the grantees' participation. Title I participants who have received funds after the effective date of the 1978 Amendments have been advised by Congress that they will be held responsible in administrative proceedings with a right of judicial review for Title I funds that are misapplied. Requiring less is simply inconsistent with our concept of fairness.

We therefore hold that an administrative agency has no authority to order repayments of funds misapplied or misspent by federal grant participants unless Congress, at the time the funds are received, has declared its intention to empower the agency to exercise such a remedy. In the absence of congressional authority, the remedy exists, if at all, only at common law. We further hold that if an agency employing an advance-funding scheme such as that provided for in Title I relies on a common-law right to recover misspent funds, it may do so only by maintaining a civil action in a court of competent jurisdiction.

Accordingly, the petitions for review will be granted and the orders of the Depart-

order of the Department resulting from procedures similar to those employed here. The court's opinion fails to reveal that the arguments considered in this opinion were pressed

and, in such absence, we will not assume that the Fourth Circuit ruled on the issue that presently confronts us.

ment will be reversed and the cases remanded with instructions to vacate the orders requiring a repayment by petitioners of previously received Title I funds.[24]

A. LEON HIGGINBOTHAM, Circuit Judge, concurring.

I concur in the holding of the court, specifically, that the Department was not empowered by statute to order the states to repay the amounts that were determined to have been misspent.

I cannot agree that the issue of what common law remedies the Department may have had is properly before us, because it is clear that no such remedies were exercised by the Department in these cases. I therefore believe that the court's discussion of the scope of the Department's setoff remedy is dictum.

With that understanding, I concur.

24. Because we do not reach the issue of the regularity of the proceedings at the agency level, the Department's motion to strike the affidavit of William M. Dallam, appended to petitioner Pennsylvania's reply brief, will be granted.

