**MARYLAND DEPARTMENT OF HUMAN RESOURCES, et al.,** Appellants,

v.

**DEPARTMENT OF HEALTH AND HUMAN SERVICES, et al.**

No. 83–2344.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 19, 1984.

Decided June 7, 1985.

Ralph S. Tyler, III, Baltimore, Md., for appellants.

Mitchell R. Berger, Asst. U.S. Atty., Washington, D.C., with whom Joseph E. diGenova, U.S. Atty., Royce C. Lamberth and R. Craig Lawrence, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellees.

Before WALD, EDWARDS and BORK, Circuit Judges.

Opinion for the Court filed by Circuit Judge BORK.

BORK, Circuit Judge:

The Maryland Department of Human Resources ("Maryland" or "MDHR") appeals from a district court order upholding a final decision by the Department of Health and Human Services ("HHS"). HHS determined that Maryland, during 1977 and 1978, misspent $207,350 in federal grant monies received pursuant to Title XX of the Social Security Act. That Act, until amended in 1981, provided federal grants-in-aid to participating states to reimburse them for funds spent in providing social services to low-income individuals, including expenditures that related to training social services personnel. 42 U.S.C. §§ 1397–1397f (1976). HHS "disallowed a total of $207,350 of Federal Financial Participation (FFP) for the Title XX Training Program," and directed Maryland to "report the amount of this allowance on line 10B of form SRS–OA41 for the quarter ended September 30, 1982." Letter from HHS Regional Administrator Eileen Bradley to MDHR Secretary Kalman R. Hettleman (Oct. 25, 1982) [hereinafter cited as Bradley Letter], J.A. at 46.

The first issue in this case is easily stated. Maryland claims that the determination that it misspent $207,350 is erroneous. In Part III of this opinion, we reject that claim and affirm the district court's decision in this respect.

The second, third, and fourth issues all presuppose that Maryland in fact misspent federal funds. The questions that then arise are (1) whether HHS has a right to recover; (2) assuming HHS has such a right, what remedies are available to enforce that right; and (3) whether the question of remedies was decided by HHS's final order and so was properly before the district court. We consider these issues in Part IV, and conclude that HHS has a right of recovery, that HHS is authorized to withhold funds, and that the issue of withholding as a remedy was properly before the district court.

I.

The Title XX grant-in-aid program defined training expenses for social services personnel to include "training at educational institutions through grants to such insti-

tutions or by direct financial assistance to students enrolled in such institutions." 42 U.S.C. § 1397a(a)(1) (1976). Under regulations promulgated by HHS to implement Title XX, states wishing to receive this training subsidy were required, *inter alia,* to select the students to be trained, to approve the training programs themselves, and to ensure that student trainees were legally obliged to work for a state social services agency after completing their training (provided employment was offered). 45 C.F.R. § 228.83(a)(2)(i), (ii), (iii) (1977). The states were required to make the employment obligation effective by offering trainees employment within six months after they completed their training, "unless precluded by Merit System requirements, legislative cuts, position freezes, or other circumstances beyond the agency's control." 45 C.F.R. § 228.83(b)(1) (1977).

Title XX contained the following provision dealing with funds spent by a state in violation of Title XX funding conditions:

(1) Prior to the beginning of each quarter the Secretary shall estimate the amount to which a State will be entitled under this section for that quarter on the basis of a report filed by the State containing its estimate of the amount to be expended during that quarter with respect to which payment must be made under this section, together with an explanation of the bases for that estimate.

(2) The Secretary shall then pay to the State, in such installments as he may determine, the amount so estimated, reduced or increased to the extent of any overpayment or underpayment which the Secretary determines was made under this section to the State for any prior quarter and with respect to which adjustment has not already been made under this subsection.

42 U.S.C. § 1397a(b) (1976).

Effective October 1, 1981, Congress amended Title XX to provide for block grants to participating states for social services. The block grants were in lieu of the specific grants-in-aid featured in the predecessor Title XX program. Pub.L. No. 97–

35, § 2352(a), 95 Stat. 357, 867 (1981). The stated goals of Title XX remain unchanged, *compare* 42 U.S.C. § 1397 (1976) *with* 42 U.S.C. § 1397 (1982). The "new" Title XX includes the following provision for recovery of misspent federal funds: "Each State shall repay to the United States amounts ultimately found not to have been expended in accordance with [Title XX], or the Secretary may offset such amounts against any other amount to which the State is or may become entitled under [Title XX]." 42 U.S.C. § 1397e(b) (1982).

The events leading to this appeal began in August, 1981, when HHS audited Maryland's Title XX training program for fiscal years 1977 and 1978. The HHS auditors reported that Maryland had neglected to determine whether it would need to employ the trainees receiving assistance, and, contrary to HHS regulations, delegated to the schools involved "all functions concerning financial assistance to students." Audit Report at 14, J.A. at 19. The delegated functions included "selecting students to receive assistance, obtaining employment agreements from the students selected, providing assistance payments, following up on students who completed training to ensure that they were complying with the agreements, and recouping the amount of financial assistance provided students who did not comply with the agreements." *Id.* at 15, J.A. at 20. "These circumstances combined," the audit report concluded, "resulted in 153 of the 228 graduates who received stipends not meeting their employment agreements either because they chose not to, or because DHR did not offer them employment." *Id.* at 13, J.A. at 18. The report recommended that the federal share of the stipends received by the 153 non-complying trainees, which totalled $207,350, be "disallowed." *Id.* at 17, J.A. at 22.

The HHS Regional Administrator adopted the auditors' recommendation. Letter from HHS Regional Administrator W.A. Crunk to MDHR Secretary Kalman R. Hettleman (Feb. 10, 1982) [hereinafter cited as Crunk Letter], J.A. at 33–34. Maryland appealed to the HHS Departmen-

tal Grant Appeals Board, which upheld the disallowance, Board op. at 1, J.A. at 34–45, and HHS thereafter directed Maryland to "report the amount of this disallowance on line 10B of form SRS–OA41 for the quarter ended September 30, 1982." Bradley Letter, J.A. at 46. Maryland then brought this action challenging HHS's final decision in the district court. The United States received permission to intervene as a party defendant in order to assert a counterclaim against Maryland. The counterclaim asked for judgment in the amount of the disallowed funds. The district court affirmed HHS's final decision. The district court both upheld the disallowance and, reaching the question of remedies, held that "administrative recovery by HHS was in this case both rational and proper." Mem. op. at 8, J.A. at 54. Because the district court affirmed HHS's authority to direct administrative recovery, it dismissed the motion for judgment on the counterclaim as moot. This appeal followed.

## II.

Before passing to the merits of this appeal, we first specify the grounds on which our jurisdiction rests. There is no provision in the Social Security Act for review of administrative action taken under Title XX. As the Supreme Court recently observed, however, in administrative cases where the organic statute is silent on the subject of judicial review "[t]he presumption that review is available, see 5 U.S.C. §§ 701(a), 702, 704; *Abbott Laboratories v. Gardner*, 387 U.S. 136, 140, 87 S.Ct. 1507, 1510, 18 L.Ed.2d 681 (1967), coupled with the absence of any indication in the statute that the decision is committed wholly to the discretion of the agency or that review is otherwise precluded, see 5 U.S.C. § 701(a), leads to the conclusion that the district court[ ] would have had jurisdiction under the general grant of jurisdiction over cases involving federal questions, 28 U.S.C. § 1331 (1976 ed. Supp. ed. V)." *Bell v. New Jersey*, 461 U.S. 773, 778 n. 3, 103 S.Ct. 2187, 2190 n. 3, 76 L.Ed.2d 312 (1983) (dictum) (additional citations omitted).[1] The Court's statement was dictum because Congress had specifically provided for judicial review of the agency action challenged in *Bell*. But since that statement was made in a context closely analogous to the situation here, we attach some weight to it as an indication that the district court had jurisdiction under 28 U.S.C. § 1331, and that we accordingly have jurisdiction to review the district court's decision under 28 U.S.C. § 1291 (1982). Nonetheless, because the point is jurisdictional, we shall explain why we think the analysis sketched in *Bell* can properly be applied here.

1. The Supreme Court has clearly indicated that the Administrative Procedure Act itself, although it does not create subject-matter jurisdiction, *Califano v. Sanders*, 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977), does supply a generic cause of action in favor of persons aggrieved by agency action. *See Block v. Community Nutrition Institute*, —— U.S. ——, ——, 104 S.Ct. 2450, 2454, 81 L.Ed.2d 270 (1984); *Chrysler Corp. v. Brown*, 441 U.S. 281, 317–18, 99 S.Ct. 1705, 1725–26, 60 L.Ed.2d 208 (1979). Of course, the APA cause of action cannot apply here unless a state or a state agency is a "person" within the meaning of the APA, which defines that term as "includ[ing] an individual, partnership, corporation, association, or public or private organization other than an agency [of the United States]." 5 U.S.C. § 551(2)(1982). Certainly a state or a state agency could be considered a "public ... organization." The Supreme Court manifestly assumed as much in *Bell*, for the Court stated in dictum that a state could have obtained judicial review under the APA prior to the adoption of the special review provisions that were held applicable in that case. *See* 461 U.S. at 777 n. 3, 792, 103 S.Ct. at 2190 n. 3, 2198. The little case law we have found that bears on this question supports that dictum and its underlying assumption that a state is a person within the meaning of the APA. Section 551(2)'s definition of person has been held to include an agency of a foreign government, *Stone v. Export-Import Bank*, 552 F.2d 132, 136 (5th Cir.1977), *cert. denied*, 434 U.S. 1012, 98 S.Ct. 726, 54 L.Ed.2d 756 (1978), and a foreign government itself. *Neal-Cooper Grain Co. v. Kissinger*, 385 F.Supp. 769, 776 (D.D.C. 1974). We agree with the *Stone* court that there is "no warrant for reading into ... § 551(2) a limitation on the term 'person' that Congress neither put there nor demonstrated any intention to put there." 552 F.2d at 137. If a foreign government and its agencies are persons within the meaning of the APA, it seems clear that a state and its agencies also are.

Our explanation requires us to establish two propositions. The first proposition is that the equitable relief sought here falls within the scope of the Administrative procedure Act's waiver of sovereign immunity, which is limited to actions "seeking relief other than money damages." 5 U.S.C. § 702 (1982). The second is that the Tucker Act does not preclude the invocation of section 702's waiver of sovereign immunity or the assertion of general federal question jurisdiction over Maryland's claims.

### A.

■ We turn first to the question whether the relief Maryland seeks is equivalent to money damages. Maryland asked the district court for a declaratory judgment and for injunctive relief "enjoin[ing] defendants from reducing funds otherwise due to plaintiffs, or imposing any sanctions on such funds for alleged Title XX violations." Complaint for Declaratory and Injunctive Relief, Record, tab 1, at 5. We are satisfied that the relief Maryland seeks here is not a claim for money damages, although it is a claim that would require the payment of money by the federal government.

We begin with the ordinary meaning of the words Congress employed. The term "money damages," 5 U.S.C. § 702, we think, normally refers to a sum of money used as compensatory relief. Damages are given to the plaintiff to *substitute* for a suffered loss, whereas specific remedies "are not substitute remedies at all, but attempt to give the plaintiff the very thing to which he was entitled." D. Dobbs, *Handbook on the Law of Remedies* 135 (1973). Thus, while in many instances an award of money is an award of damages, "[o]ccasionally a money award is also a specie remedy." *Id.* Courts frequently describe equitable actions for monetary relief under a contract in exactly those terms. *See, e.g., First National State Bank v. Commonwealth Federal Savings & Loan Association,* 610 F.2d 164, 171 (3d Cir.1979) (specific performance of contract to borrow money); *Crouch v. Crouch,* 566 F.2d 486,

488 (5th Cir.1978) (contrasting lump-sum damages for breach of promise to pay monthly support payments with an order decreeing specific performance as to future installments); *Joyce v. Davis,* 539 F.2d 1262, 1265 (10th Cir.1976) (specific performance of a promise to pay money bonus under a royalty contract).

In the present case, Maryland is seeking funds to which a statute allegedly entitles it, rather than money in compensation for the losses, whatever they may be, that Maryland will suffer or has suffered by virtue of the withholding of those funds. If the program in this case involved in-kind benefits this would be altogether evident. The fact that in the present case it is money rather than in-kind benefits that pass from the federal government to the states (and then, in the form of services, to program beneficiaries) cannot transform the nature of the relief sought—specific relief, not relief in the form of damages. *Cf. Clark v. Library of Congress,* 750 F.2d 89, 104 n. 33 (D.C.Cir.1984) (dictum) (describing an action to compel an official to repay money improperly recouped as "in essence, specific relief").

However, the Tenth Circuit has recently held, on the basis of its reading of the legislative history of the APA waiver of sovereign immunity, that "§ 702 should be read with a practical eye, with the focus upon the effect of the claim—does it involve a claim for money, or does it seek only to effect action? It is solely the latter class of claims which fall within the consent to suit granted by § 702." *New Mexico v. Regan,* 745 F.2d 1318, 1321 n. 3 (10th Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 2138, 85 L.Ed.2d 496 (1985). On this reasoning it would follow that Maryland could not obtain the relief it seeks against the United States under the APA. We respectfully differ with the standard put forward by the *New Mexico* court.

The only specific legislative history the *New Mexico* court offered in support of its position was a passage from the House Report that refers once to the exclusion of "monetary relief" and twice to the exclu-

sion of "money damages" in actions against the United States under the APA. H.R.Rep. No. 1656, 94th Cong., 2d Sess. 11 (1976), U.S.Code Cong. & Admin.News 1976, p. 6121. Even standing alone, we are not persuaded that this passage indicates that all relief that will have the effect of requiring the federal government to pay money should be deemed to be money damages and not specific relief. It is at least as likely that the passage means that the only relief that is deemed to be monetary relief is relief that entails money damages.

One consideration could conceivably support the view taken by the Tenth Circuit. It is possible that the use of the term "money damages" in section 702 was influenced by historic practice under the Tucker Act, which seems to have drawn a line between monetary relief (whether awarded as damages or not) and nonmonetary relief, rather than following the more traditional common law distinction between money damages and specific relief (whether involving money or not). *See United States v. Jones,* 131 U.S. 1, 18, 9 S.Ct. 669, 671, 33 L.Ed. 90 (1889) (Tucker Act jurisdiction does not extend to claims for specific performance or other equitable relief but does "include claims for money arising out of equitable as well as maritime and legal demands"); *Fidelity Construction Co. v. United States,* 700 F.2d 1379, 1384 (Fed. Cir.1983) (indicating that *Jones* is still good law). *See also Eastport Steamship Corp. v. United States,* 372 F.2d 1002, 1008, 178 Ct.Cl. 599 (1967); *Larionoff v. United States,* 533 F.2d 1167, 1181 (D.C.Cir.1976), *aff'd,* 431 U.S. 864, 97 S.Ct. 2150, 53 L.Ed.2d 48 (1977). Were we convinced that Congress had this obscure feature of Tucker Act jurisdiction in mind, we might conclude that the words "money damages" in section 702 include all relief that takes the form of money. Specific monetary relief would then, as the Tenth Circuit holds, be unavailable under the APA because it would not come within section 702's waiver of sovereign immunity.

We think, however, that the legislative history suggests otherwise. Neither the House nor Senate Reports (there was no

Conference Report) intimates that Congress intended the term "money damages" as a shorthand for "whatever forms of monetary relief would be available under the Tucker Act." To the contrary, the federal sovereign immunity case law, which the Reports discuss at length, *see* H.R.Rep. No. 1656, *supra,* at 5–8; S.Rep. No. 996, 94th Cong., 2d Sess. 4–8 (1976), suggests that Congress would have understood the recovery of specific monies to be specific relief in this context. *See, e.g., Larson v. Domestic & Foreign Commerce Corp.,* 337 U.S. 682, 688, 69 S.Ct. 1457, 1460, 93 L.Ed. 1628 (1949) (contrasting "damages" and "specific relief" and including in the latter category "the recovery of specific property or monies").

Moreover, while reiterating that Congress intended "suits for damages" to be barred, both Reports go on to say that "the time [has] now come to eliminate the sovereign immunity defense in *all equitable actions for specific relief* against a Federal agency or officer acting in an official capacity." H.R.Rep. No. 1656, *supra,* at 9; S.Rep. No. 996, *supra,* at 8, U.S.Code Cong. & Admin.News 1976, p. 6129 (emphasis added). That sweeping declaration strongly suggests that Congress intended to authorize equitable suits for specific monetary relief as we have defined that category. This inference is made virtually conclusive by the fact that both Reports then enumerate several kinds of cases in which the sovereign immunity defense had continued to pose an undesirable bar to consideration of the merits: that listing includes cases involving "administration of Federal grant-in-aid programs." H.R.Rep. No. 1656, *supra,* at 9; S.Rep. No. 996, *supra,* at 8, U.S.Code Cong. & Admin. News 1976, p. 6129. Specific relief in cases involving such programs will, of course, often result in the payment of money from the federal treasury. It seems to us, then, that the legislative history supports the proposition that Congress used the term "money damages" in its ordinary signification of compensatory relief. We therefore hold that Maryland's claims for specific

relief, albeit monetary, are for "relief other than money damages" and therefore within the waiver of sovereign immunity in section 702.[2]

**B.**

■ We think it also clear that there is no Tucker Act jurisdiction in this case that prevents the application of section 702's waiver of sovereign immunity. As relevant here, the Tucker Act, 28 U.S.C. § 1491(a)(1) (1982), gives the United States Claims Court jurisdiction (1) over contract claims against the United States, and (2) over "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department," while giving the district courts concurrent jurisdiction over both types of claims so long as they do not exceed $10,000. 28 U.S.C. § 1346(a)(2) (1982).[3] It is settled law that the Tucker Act confers jurisdiction and consent to suit against the United States, *United States v. Mitchell*, 463 U.S. 206, 216, 103 S.Ct. 2961, 2967, 77 L.Ed.2d 580 (1983), but "does not create any substantive right enforceable

against the United States for money damages." *Id.* (*quoting United States v. Mitchell*, 445 U.S. 535, 538, 100 S.Ct. 1349, 1351, 63 L.Ed.2d 607 (1980)).

■ The presence of Tucker Act jurisdiction may sometimes present an obstacle to relief against the United States under the APA because section 702's waiver of federal sovereign immunity is withdrawn by the second proviso to section 702 where "any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." 5 U.S.C. § 702 (1982).[4] We break no new ground, then, by noting that the fact that a plaintiff's substantive claim is cognizable under the Tucker Act may, at least in some circumstances, bar the plaintiff from obtaining, under the APA, either the relief that would be available under the Tucker Act or alternative forms of relief. *See, e.g.,* H.R.Rep. No. 1656, *supra*, at 13, U.S.Code Cong. & Admin.News 1976, p. 6133 (stating that as to "specific performance of government contracts," "a statute granting consent to suit, i.e., the Tucker Act, 'impliedly forbids' re-

---

2. We emphasize that by deciding that the APA's waiver of sovereign immunity applies to Maryland's claims we are not to be understood as holding that Maryland's claims are necessarily claims against the United States. Maryland named the Secretary of HHS as a defendant as well as HHS itself. It is therefore conceivable that Maryland's claims could be characterized as claims that a federal officer's actions were *ultra vires. See, e.g., Larson v. Domestic & Foreign Commerce Corp.,* 337 U.S. 682, 701–02, 69 S.Ct. 1457, 1467–68, 93 L.Ed. 1628 (1949). It is also conceivable that although the relief sought here "would expend itself on the public treasury," *Dugan v. Rank,* 372 U.S. 609, 620, 83 S.Ct. 999, 1006, 10 L.Ed.2d 15 (1963) (*quoting Land v. Dollar,* 330 U.S. 731, 738, 67 S.Ct. 1009, 1012, 91 L.Ed. 1209 (1946)), that relief would be sufficiently prospective that it could be awarded against the Secretary as an officer acting *ultra vires* without making this a suit against the United States. *See De Lao v. Califano,* 560 F.2d 1384, 1389–91 (9th Cir.1977) (federal sovereign immunity bars retroactive monetary relief but does not bar prospective monetary relief). *Cf. Edelman v. Jordan,* 415 U.S. 651, 664, 668, 94 S.Ct. 1347, 1356, 1358, 39 L.Ed.2d 662 (1974) (state sovereign immunity bars injunction against a state officer compelling payment from the state treasury of "an accrued monetary liability," but does not bar a prospective injunction

that would forbid the officer from continuing to deny payment of benefits as they accrued in the future). The technicalities of the *ultra vires* doctrine make it formidable to apply. Moreover, assuming that the distinction between prospective and retroactive relief would be controlling, the state of the record in this case would make it difficult to apply that distinction to the relief Maryland seeks. We therefore decline to engage in an analysis of whether Maryland's claims against the Secretary are claims against the United States for sovereign immunity purposes. Because we hold that the APA waiver of sovereign immunity applies, resolution of that issue cannot affect our jurisdiction.

3. The dispute here involves an amount in excess of $10,000, and consequently there is no possibility that the district court's jurisdiction could have been based on the Tucker Act.

4. Alternatively, the Tucker Act may pose a problem on the theory, which we neither endorse nor reject, that it limits the general federal question jurisdiction of the district courts. *See, e.g., Graham v. Henegar,* 640 F.2d 732, 734 & n. 6 (5th Cir.1981) (Tucker Act limits federal question jurisdiction); *but see, e.g., Bor-Son Building Corp. v. Heller,* 572 F.2d 174, 182 n. 14 (8th Cir.1978) (Tucker Act does not limit federal question jurisdiction).

lief other than the remedy provided by the Act"); *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C.Cir.1982) (court must determine whether a claim "so clearly presents a disguised contract action that jurisdiction over the matter is properly limited to the Court of Claims"); *see also B.K. Instrument, Inc. v. United States*, 715 F.2d 713, 725–28 (2d Cir.1983). There is a complex and not completely uniform body of case law dealing with when and to what extent the presence of Tucker Act jurisdiction precludes the availability of relief under the APA. We do not propose to address these issues, because we think the need to do so only arises when a plaintiff's substantive claim—apart from the type of relief the complaint seeks—is a claim over which Tucker Act jurisdiction could be invoked. If not, then there is no possibility that the preclusive effects of the Tucker Act, whatever their scope, can come into play. Because, as we show next, Maryland's claims do not come within the jurisdiction conferred by the Tucker Act, the Tucker Act cannot preclude Maryland from relying on section 702's waiver of sovereign immunity.

We must consider two possible sources of Tucker Act jurisdiction: that Maryland's claims fall within the contract claims jurisdiction conferred by the Tucker Act, and that Maryland's claims fall within the Tucker Act jurisdiction over claims against the United States founded upon a federal statute. We address these questions seriatim.

There is no doubt that Maryland's claims do not fall within the contract claims jurisdiction unless those claims arise out of an "express or implied contract" as that phrase is used in the Tucker Act. *See Merritt v. United States*, 267 U.S. 338, 341, 45 S.Ct. 278, 279, 69 L.Ed. 643 (1925) (holding that a claim on an implied-in-law contract does not fall within Tucker Act jurisdiction); *Sutton v. United States*, 256 U.S. 575, 581, 41 S.Ct. 563, 565, 65 L.Ed. 1099 (1921) (claim for unjust enrichment outside Tucker Act jurisdiction). *See also Mitchell*, 463 U.S. at 218, 103 S.Ct. at 2969 (discussing *Merritt*). We think that Maryland's claims do not meet this jurisdictional

prerequisite. To be sure, Maryland's request for an injunction enjoining HHS from withholding funds is somewhat analogous to a request for specific performance of a contract that obliges the promisor to pay money. But we have found no case in which the contract claims provision of the Tucker Act has been held applicable to a dispute between a state and the federal government over the "contractual" rights and obligations of these "parties" to a federally funded program. Although the principles of contract law undoubtedly have a role to play in such disputes, *see Pennhurst State School & Hospital v. Halderman*, 451 U.S. 1, 17, 101 S.Ct. 1531, 1539, 67 L.Ed.2d 694 (1981), we see no reason to assume that what is involved here is a contract within the meaning of the Tucker Act. As the Supreme Court recently noted, "[u]nlike normal contractual undertakings, federal grant programs originate in and remain governed by statutory provisions expressing the judgment of Congress concerning desirable public policy." *Bennett v. Kentucky Department of Education*, —— U.S. ——, ——, 105 S.Ct. 1544, 1552, 84 L.Ed.2d 590 (1985). Maryland's claims arise under a federal grant program and turn on the interpretation of statutes and regulations rather than on the interpretation of an agreement negotiated by the parties. It seems to us, then, that Maryland's claims are not contract claims for Tucker Act purposes. *Cf. Tennessee v. Dole*, 749 F.2d 331, 335 (6th Cir.1984) (describing a state's request for an injunction directing a federal agency not to take any administrative action to retrieve by setoff monies allegedly owed by the state as "sound[ing] in restitution, not contract").

We now consider whether Maryland's claims fall within the Tucker Act's grant of jurisdiction over claims founded upon a federal statute. The only requirement we need consider is the rule—which, as we explain below, is jurisdictional—that in order for a non-contractual claim to be "cognizable under the Tucker Act," the plaintiff "must demonstrate that the source of substantive law he relies upon 'can fairly be

interpreted as mandating compensation by the Federal Government for the damages sustained.'" *United States v. Mitchell,* 463 U.S. at 216–17, 103 S.Ct. at 2972–2973 (*quoting United States v. Testan,* 424 U.S. 392, 400, 96 S.Ct. 948, 954, 47 L.Ed.2d 114 (1976)). As previously mentioned, the Tucker Act itself does not fulfill this requirement because it does not create substantive rights enforceable against the United States for money. *See Testan,* 424 U.S. at 398, 96 S.Ct. at 953.

■ That this requirement of "cognizab[ility]" is jurisdictional is clearly implied by *Mitchell.* For the *Mitchell* Court, after concluding that the claimants in that case did have a cause of action for money damages under the substantive law on which they relied, held that "the Court of Claims therefore has jurisdiction over respondents' claims." 463 U.S. at 228, 103 S.Ct. at 2974. Moreover, both the Federal Circuit and this court have relied on this interpretation of the Tucker Act jurisdiction. *See United States v. Connolly,* 716 F.2d 882, 886–87 (Fed.Cir.1983) (holding that the trial court did not "possess[ ] jurisdiction" under the Tucker Act over first amendment claim for damages because "the first amendment, standing alone, cannot be so interpreted [as] to command the payment of money"); *Clark v. Library of Congress,* 750 F.2d at 103 n. 31 (same). *See also Tennessee v. Dole,* 749 F.2d at 336. *But see Hahn v. United States,* 757 F.2d 581, 588 n. 4 (3d Cir.1985) (dictum) (suggesting, in Tucker Act context, that plaintiffs' failure to cite a

law conferring a substantive right to recovery against the United States "is not a jurisdictional matter"). Finally, a recent decision of this court has squarely stated, after careful analysis, that the existence of a substantive right to recovery is a jurisdictional requirement under the Tucker Act. *Van Drasek v. Lehman,* 762 F.2d 1065, 1070 & n. 7 (1985). We conclude, then, that Maryland's non-contractual claims against the United States are not within the jurisdiction conferred by the Tucker Act unless the substantive law on which Maryland relies—Title XX—can fairly be interpreted as mandating compensation by the federal government.[5]

■ The test we must apply in making this determination is settled: while "the substantive source of law may grant the claimant a right to recover damages either 'expressly or by implication,'" *Mitchell,* 463 U.S. at 217 n. 16, 103 S.Ct. at 2968 n. 16 (*quoting Eastport Steamship,* 372 F.2d at 1007), the general rule is that an implied cause of action for damages against the United States will not lightly be inferred. *See, e.g., Army & Air Force Exchange Service v. Sheehan,* 456 U.S. 728, 739–40, 102 S.Ct. 2118, 2124–25, 72 L.Ed.2d 520 (1982).[6] Under that standard, we think it is clear that Title XX does not create a right to money damages or other monetary relief in favor of a state.

To begin with, Title XX does not expressly provide a cause of action of any kind in favor of participating states. Thus the

---

**5.** There is some disparity between this rule that failure to state a cognizable claim is a jurisdictional defect under the Tucker Act and the general rule that failure to state a claim calls for judgment on the merits rather than dismissal for lack of jurisdiction. *Bell v. Hood,* 327 U.S. 678, 682, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1946). Whatever the reasons for this difference, we note that in this context it serves the sensible goal of ensuring that relief under the APA is not precluded by the Tucker Act unless, at a minimum, a remedy is actually available under the Tucker Act.

**6.** We have found no suggestion in the Tucker Act case law that the standard for implying a right to money damages against the United

States is different from the standard for implying a right to specific monetary relief against the United States. *See generally Eastport Steamship Corp.,* 372 F.2d at 1008 (suggesting that this standard applies to all claims "that some specific provision of law embodies a command to the United States to pay the plaintiff some money, upon proof of conditions which he is said to meet"). Therefore our conclusion that Title XX does not give Maryland a right to money damages also implies that Title XX does not give Maryland a right to specific monetary relief against the United States. We assume, without deciding, that such relief could be granted under the Tucker Act in a non-contractual case. *See supra* p. 1447.

only question is whether an implied cause of action for money would lie in favor of a state. Comparison with *Mitchell* demonstrates that such a cause of action cannot fairly be implied under Title XX. In *Mitchell,* the Court held that the statute and regulations at issue in that case mandated compensation for damages by the federal government because they "clearly establish fiduciary obligations of the Government in the management and operation of Indian lands and resources." 463 U.S. at 226, 103 S.Ct. at 2272. That holding rested on language in the relevant statutes and regulations that "directly supported the existence of a fiduciary relationship," *id.* at 224, 103 S.Ct. at 2972, on the presence of all of the necessary elements of a commonlaw trust (a trustee, a beneficiary, and a trust corpus), *id.* at 225, 103 S.Ct. at 2972, and on "the undisputed existence of · a general trust relationship between the United States and the Indian people." *Id.* Here, there is no language in Title XX making the Secretary a fiduciary. Even if the Secretary could be considered a fiduciary, and the elements of a trust established, there is no reason to think that the beneficiary of that trust would be a state rather than the individual recipients of Title XX services. Finally, we are aware of no "general trust relationship" between states and the federal government comparable to the special obligation of trust the federal government bears in its dealings with the Indians. *See Seminole Nation v. United States,* 316 U.S. 286, 296, 62 S.Ct. 1049, 1054, 86 L.Ed. 1480 (1942). We therefore hold that Maryland's claims do not fall within the non-contractual branch of Tucker Act jurisdiction, because Title XX cannot fairly be interpreted as mandating compensation by the federal government in favor of an aggrieved state. Since, then, Maryland's claims are not within either branch of Tucker Act jurisdiction, there is no doubt that section 702's waiver of sovereign immunity applies to Maryland's claims and that those claims were properly adjudicated under the federal question jurisdiction of the district court.

## III.

Maryland raised two distinct claims relating to the determination that it misspent funds in the district court. First, Maryland argued that it was excused from hiring the trainees whose stipends were the basis for the disallowance, because "it was precluded from hiring the 153 students for reasons beyond the state's control, most notably the requirements of the state merit system law and state hiring freeze." Mem. op. at 2, J.A. at 48. Secondly, Maryland contended that the disallowance was not supported by substantial evidence. *Id.* at 3, J.A. at 49.[7]

Maryland's first claim—that HHS violated its own regulations when it disallowed the funds at issue here—rests on the provision in the regulations that excuses a state's failure to offer employment to graduating employees if such offers are "precluded by Merit System requirements, legislative cuts, position freezes, or other circumstances beyond the agency's control." 45 C.F.R. § 228.83(b)(1) (1977). As Maryland reads the regulation, "[w]hether the students would have been denied employment for other reasons is irrelevant," Brief for Appellants at 8, so long as they would also have been denied employment by virtue of one or more of the enumerated circumstances beyond the agency's control.

7. We agree with the district court that Maryland cannot prevail on its claims that the agency failed to follow its own regulations and that its conclusions do not follow from the record evidence unless the agency's actions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). *See* mem. op. at 4, J.A. at 50. Maryland's attempt to obtain review of its second claim under the less deferential substantial-evidence standard, *see American Paper Institute, Inc. v. American Electric Power Service Corp.,* 461 U.S. 402, 412 n. 7, 103 S.Ct. 1921, 1927 n. 7, 76 L.Ed.2d 22 (1983), must be rejected because that standard applies only when a formal evidentiary hearing is prescribed by statute. 5 U.S.C. § 706(2)(E). *See also Camp v. Pitts,* 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973) (per curiam). That prerequisite is not satisfied here, since the administrative appeal in this case was informal and was provided for by regulation rather than by statute. *See* 45 C.F.R. Part 16 (1982).

Since, as Maryland reads the record, it established that "[t]he State was precluded from hiring the 153 students either because they failed to meet Merit System requirements, or because of a State hiring freeze, or both," *id.* at 7, it would follow that the disallowance was improper.

■ We read both the regulation and the record differently. Maryland, HHS determined, was allowing persons to be trained whether or not there was any possibility that their services would be needed or that they would be qualified to serve if needed. *See* Audit Report at 13, J.A. at 18; Board op. at 9, J.A. at 43. We find it clear that the regulation did not intend to excuse such behavior merely because it happened to coincide with a hiring freeze. The regulation by its terms excuses only the failure to offer employment when the enumerated circumstances occur. It does not excuse failure to comply with the other funding conditions that are set forth independently in other clauses of the regulation. Maryland does not contest that it failed to select the students to be trained, and, more generally, that it abdicated its responsibility to control the manner in which grants were awarded, and to determine whether it would need to employ the trainees. Maryland.thereby violated both a variety of specific funding conditions, *see, e.g.,* 45 C.F.R. § 228.83(a)(2)(i) (state agency must select students), (b)(2) (state agency must evaluate training programs), and the general requirement of "closely controlled conditions" to be achieved through "active State agency involvement in the development of programs and selection of students...." Preamble to 45 C.F.R. Part 228, 40 Fed. Reg. 27,354 (1975). These violations were unquestionably not due to circumstances beyond Maryland's control, and it seems to us that HHS might even have been justified in disallowing the federal portion of the stipends of all 228 students in the training program on grounds of pervasive noncompliance with the funding conditions of Title XX.

Maryland argues in response that the fact that the disallowance included only the 153 trainees who did not satisfy their service obligations proves that the disallowance is actually based on Maryland's failure to offer employment to those students. HHS, however, has consistently maintained—and both the Appeals Board and the district court agreed—that "instead of imposing the 'draconian measure' of disallowing all [federal funding] for the State's expenditures, it disallowed [federal funding] only in those expenditures which, in fact, did not benefit the program." Board op. at 8, J.A. at 42. The agency's efforts to establish a connection between Maryland's various lapses and the fact that 153 trainees did not satisfy their service obligations do not belie this explanation, for those efforts can reasonably be seen as going to the tendency of Maryland's breaches of the funding conditions to impair Title XX's objectives, and as a reasonable estimate of the extent to which Maryland's breaches actually resulted in a diminution in the benefits that a well-run Title XX program would have produced. We therefore accept the agency's explanation, and find the reduced disallowance a realistic and equitable exercise of administrative discretion.

This brings us to Maryland's second contention, that "the conclusion that the 153 students did not obtain employment for reasons other than the hiring freeze and merit system requirements does not follow from the evidence." Brief for Appellants at 9 n. 2. We reject this contention, because there was every indication in the record that Maryland's loss of control over its training programs would have resulted in a surfeit of trainees whether or not a hiring freeze supervened. The auditors found, and the Board agreed, that "there was no need for graduates to fill at least two of DHR's entry levels and that in 1978 there was already a 23- and 38-year supply of candidates available to fill, respectively, the social work associate and social worker entry level positions." Board op. at 9, J.A. at 43. Even as to the most advanced social work position, which required a masters degree, the auditors found that there was already a seven-year supply of candidates available. Audit Report at 10, J.A. at 15.

Similarly, the auditors found that Maryland's failure to screen students led to a situation in which the grantees "generally scored lower on merit exams and, therefore, could not be hired by the State," *id.* at 17, J.A. at 22. Indeed, even as to the hiring freeze itself, the auditors found that "the State Agency was aware that the budget for fiscal years 1977 and 1978 provided for the elimination of over 200 positions in social services. And since the freeze started in June 1977, the State Agency had time to adjust its stipend program for fiscal year 1978," *id.*, J.A. at 22—a finding that casts doubt on whether even the effects of the freeze should be deemed to be circumstances beyond Maryland's control. Clearly, then, the agency had a rational basis for finding that "even if there had not been a hiring freeze in effect, the State would not have been able to .offer employment to the majority of the students." Board op. at 9, J.A. at 43.

While that finding does not demonstrate that exactly $207,350 in Title XX benefits were lost by virtue of Maryland's breaches of the funding conditions, we do not think such a demonstration is necessary. The funds for all 228 students were misapplied because they were spent in breach of the Title XX funding conditions. There is no single exact formula for calculating damages in these circumstances—certainly Maryland has not pointed to one. Especially in light of the dismal recordkeeping the federal auditors confronted, *see* Audit Report at 16, J.A. at 21, the agency's determination of the size of the disallowance was altogether reasonable. The record shows beyond cavil that Maryland's breaches of the federal funding conditions were of the kind that could be expected to, and in fact (on ordinary principles of joint causation) did, lead to the expenditure of federal funds without producing the benefits Title XX was intended to bring about.[8]

Whatever the limits may be on an agency's ability to apply funding condition regulations to disallow funds that were spent in technical contravention of the conditions but nonetheless produced the benefits Congress intended, we have said enough to show that this case does not force us to define them. *Cf. Bell v. New Jersey,* 461 U.S. at 794, 103 S.Ct. at 2199 (White, J., concurring) ("there is a significant issue whether a State can be required to repay if it has committed no more than a technical violation of the agreement..."). Neither the determination that a disallowance was warranted nor the choice of a measure for estimating the proper size of the disallowance was arbitrary and capricious, and the disallowance must therefore be upheld as imposed.

## IV.

### A.

Having established that HHS's determination that Maryland misspent $207,350 in federal funds was not arbitrary or capricious, we now address the matter of the rights and remedies HHS possesses when it validly determines that a state has misspent Title XX monies. This portion of the case comes to us in a most confused state. Neither party has framed the issues with precision, probably because HHS's decision became final before the Supreme Court handed down its decision in the closely analogous case of *Bell v. New Jersey,* 461 U.S. 773, 103 S.Ct. 2187, 76 L.Ed.2d 312 (1983). Accordingly, we first set out the framework for analysis of this issue in light of *Bell.*

---

**8.** We do not hold that HHS can disallow funds only if it can demonstrate that a breach of funding conditions actually resulted in the loss of the benefits those funds were intended to yield. Funding conditions presumably reflect a determination either by Congress or by the agency that these requirements are needed to ensure that funds are expended in a manner that will benefit the federal government. *See*

*Bennett v. New Jersey,* —— U.S. ——, ——, 105 S.Ct. 1555, 1563, 23 L.Ed.2d 572 (1985) (requiring repayment of Title I funds "that were spent contrary to the assurances provided by the State in obtaining the grants," and stating that "a reviewing court has no independent authority to excuse repayment based on its view of what would be the most equitable outcome").

In *Bell*, the Secretary of Education, after audit, determined that New Jersey and Pennsylvania had misapplied federal funds distributed under the provisions of Title I of the Elementary and Secondary Education Act of 1965 as amended ("ESEA"). 461 U.S. at 777, 103 S.Ct. at 2190. The Secretary then directed the states to repay the misapplied funds. *Id.*

The Secretary's decisions, in the Supreme Court's view, "merely established the amount of the deficiency owed by the States to the Federal Government, leaving for further 'discussion' the method of repayment." 461 U.S. at 779, 103 S.Ct. at 2191 (footnote omitted). The Court characterized such demands as "an initial proposal of a means of collection." *Id.* at 779 n. 4, 103 S.Ct. 2191 n. 4. The Court then held that the Secretary's decision was final (and hence reviewable) despite the fact that the means of collection were not conclusively resolved, analogizing this situation to "the ordinary adjudication by a trial court that a plaintiff has a right to damages. Although the judgment in favor of the plaintiff is not self-executing and he may have to undertake further proceedings to collect the damages awarded, that possibility does not prevent appellate review of the decision, which is final." *Id.* at 779, 103 S.Ct. at 2191.

On these grounds, and on the alternative ground that "the Secretary, who is the petitioner, has not asked us to decide what means of collection are available to him, but only whether he is a creditor," 461 U.S. at 779 n. 4, 103 S.Ct. at 2191 n. 4, the Court stated that "[s]ince the case does not present the issue of available remedies, we do not address it." *Id.* This same dichotomy between right and remedy then led the *Bell* Court to redefine the dispositive issue in the case, which the court of appeals had put in terms of "the statutory power of the Agency to order repayment of the misspent or misapplied funds," *New Jersey Department of Education v. Hufstedler*, 662 F.2d 208, 216 (3d Cir.1981), in terms of whether Title I "contemplated that States misusing federal funds would incur a debt to the Federal Government for the amount mis-

used." 461 U.S. at 782, 103 S.Ct. at 2192. The Supreme Court's formulation thus made the issue whether or not the Secretary had a statutory "right of recovery." *Id.*

The pre-1978 ESEA provision that was in effect when the funds at issue in *Bell* were misspent read as follows: "The Commissioner shall ... from time to time pay to each State, in advance or otherwise, the amount which the local educational agencies of that State are eligible to receive under this part. Such payments shall take into account the extent (if any) to which any previous payment to such State educational agency under this title (whether or not in the same fiscal year) was greater or less than the amount which should have been paid to it." Pub.L. No. 89–10, § 207(a)(1), 79 Stat. 27, 32 (1965).

New Jersey argued that this provision authorized the federal government to withhold funds for services not yet rendered by the state agencies (prospective withholding), but not to withhold funds for services already provided by the state (retroactive withholding). Furthermore, New Jersey contended that the effect of prospective withholding was to reduce the extent of the services the state was obliged to provide during the period for which the withheld funds would otherwise have been provided. The *Bell* Court rejected New Jersey's reading as "no more than remotely plausible." *Bell*, 461 U.S. at 783 n. 8, 103 S.Ct. at 2193 n. 8. The Court thought it "hardly likely that Congress intended disadvantaged children to suffer twice: once when the State misspent the funds and once when the State cancels an otherwise eligible program because of the Secretary's refusal to fund it." *Id.* Pointing to the requirement that the Secretary make his adjustment to the amount the state agencies "are *eligible* to receive," and the fact that a State only "becomes 'eligible' by giving its assurances that it will expend the grant on Title I programs," the Court reasoned that "[s]ection 207, then, must contemplate that the Federal Government will receive the same amount in Title I programs but will pay the

State something less than that amount—a net recovery." *Id.*

Since it found that "the pre-1978 version contemplated that States misusing funds would incur a debt to the Federal Government for the amount misused," *Bell,* 461 U.S. at 782, 103 S.Ct. at 2192, the Supreme Court concluded that the supervening amendments worked no significant change in the respective rights of the federal government and of the states. Accordingly, the Court did not reach the question whether the 1978 amendments, which made explicit the Secretary's right of recovery, had retroactive effect.[9]

In three respects, *Bell* furnishes controlling law for the present case. First, as to finality, the implication of the Court's finality analysis is that where the means of collection have not been conclusively resolved by the agency that issue may not be reviewable because it is not within the scope of the final order determining liability.

Second, as to retroactivity, *Bell* indicates that a reviewing court may at the outset decide whether the effect of supervening law is to change the rights of the parties that are contested in that proceeding. If no such effect is discernible, the court may pronounce on the merits without engaging in a retroactivity analysis, for as to the issue before it that determination is effectively moot.[10]

Finally, *Bell* makes plain that when a state agency misapplies federal funds two questions arise: (1) whether the federal government has a right of recovery, and (2) what remedies the federal government may use to obtain that recovery. If the federal government has a right of recovery, that means that the State must either (1) transfer funds to the federal government or (2) deliver the *same* level of benefits but receive less federal funding. The existence of a right of recovery accordingly implies that if prospective withholding is an authorized remedy, then the state may not, in response to withholding, "undertake a less extensive ... program, so that the Federal Government recovers nothing: it pays less, but it receives correspondingly less in the way of ... programs. Under that reading, the State would have no liability to the Federal Government for misspent funds." *Bell,* 461 U.S. at 783 n. 8, 103 S.Ct. at 2193 n. 8.

Consequently, where a statute gives the federal government a right of recovery and also authorizes prospective withholding as a remedy, the state remains obligated to provide all the services that it promised to supply in return for the funds that were then prospectively withheld in satisfaction of the state's debt to the feder-

9. By contrast, the court of appeals had engaged in a retroactivity analysis because it concluded that the pre-amendment version of ESEA authorized only "an offset against current or prospective grant fund disbursements to [state agencies]." *New Jersey Dep't of Education v. Hufstedler,* 662 F.2d 208, 214 (3d Cir.1981), *rev'd sub nom. Bell v. New Jersey,* 461 U.S. 773, 103 S.Ct. 2187, 76 L.Ed.2d 312 (1983). Since the 1978 amendments to ESEA explicitly authorized the Secretary to collect refunds of misspent funds, 662 F.2d at 215, the rights of the federal government and of the states depended on which law applied.

10. In *Bennett v. New Jersey,* —— U.S. at ——, 105 S.Ct. at 1561, the Supreme Court concluded, in the context of the same litigation that was before it in *Bell,* that "absent a clear indication to the contrary in the relevant statutes or legislative history, changes in the substantive standards governing federal grant programs do not alter obligations and liabilities arising under earlier grants." That presumption, which is an exception to "the general principle that a court must apply the law in effect at the time of its decision," *id.* at ——, 105 S.Ct. at 1560 (citation omitted), may well apply to the question whether the federal government has a right of recovery when funds are misspent, as well as to the question of what standards apply in determining whether funds have been misspent. Since we have found that the federal government has a right to recovery under both the pre- and post-amendment versions of Title XX, the result we reach is the same whether or not the presumption announced in *Bennett* applies here. We accordingly refrain from deciding whether or not the *Bennett* presumption applies to the issue of the federal government's right of recovery, because the parties have had no opportunity to address that question and because that question can best be resolved in a case in which it may affect the outcome.

al government.[11] If a state then proceeds to reduce the size of its federally funded program, the state has committed a new and independent breach of the funding conditions, which gives rise to a new debt to the federal government.

## B.

The difficulty in the present case, which surfaces both in relation to the issue of rights and the issue of remedies, is this: it is unclear whether HHS understands the nature of its right of recovery, and it is all too clear that HHS has not enlightened Maryland on how its disallowance letter affects Maryland's rights and obligations under Title XX. Specifically, HHS has not definitely explained whether it intends to withhold funds retroactively or prospectively. Furthermore, HHS has never taken the position (though it has not disavowed it either) that if it withholds funds prospectively, Maryland remains obliged to fund the Title XX program at the level originally contemplated. Thus, HHS has not suggested that it views prospective withholding as a remedy that it would supplement by demanding that the state not reduce its block grant program in response to the withholding. Instead, HHS has consistently asserted (before the district court and this court), without further qualification, that it has the authority to withhold funds whether those funds are for services already rendered or not. *See* Brief for Ap-

pellees at 10 n. 6, 20–21 & n. 8; Defendants' Memorandum in Support of Defendants' Motion for a Judgment of Affirmance, Record, tab 18, at 15–16 & n. 10. This raises the possibility that HHS is not in fact asserting a right of recovery but is instead taking a position similar to the one New Jersey advocated in *Bell:* that the federal agency's only statutory right is the right to withhold funds, and that the state is entitled to respond to withholding by reducing the size of its service-provider program.

We have considered this possibility, but we think it becomes clear upon examination that HHS is attempting to enforce a statutory "right of recovery," as that phrase was used in *Bell:* that is, HHS claims that Maryland is made liable by statute, as on a debt, for the misspent funds. This issue was squarely presented to the Board, which asked "whether the State's *debt* would be extinguished because the State is no longer receiving funds under the former Title XX," Board op. at 5, J.A. at 39, and concluded, relying on the "[a]uthority to disallow and *recover* funds under the former Title XX," that "the Agency did not exceed its authority when it issued this disallowance." *Id.,* J.A. at 39 (emphasis added). The Board's reasoning and its language, we think, plainly indicate that HHS was asserting a right of recovery, not merely the authority to withhold funds prospectively. That right of recovery was sus-

---

**11.** The lower court in *Bell* took a different view in distinguishing a case the government cited to it as an example of "a wholly administrative utilization of a common-law right of recovery." *Hufstedler,* 662 F.2d at 217. That case, *Mount Sinai Hospital v. Weinberger,* 517 F.2d 329 (5th Cir.1975), *cert. denied,* 425 U.S. 935, 96 S.Ct. 1665, 48 L.Ed.2d 176 (1976), involved withholding by HEW of funds owing to a hospital for past services furnished to Medicare patients. Because Medicare funds are paid out to hospitals as reimbursement for services already rendered, the *Hufstedler* court said that administrative utilization of the "common-law right of setoff" would mean that "Medicare beneficiaries still receive treatment, but the Government need not pay for those services outside the program's coverage." 662 F.2d at 217. By contrast, the Title I program in *Hufstedler* used an "advance-funding method of distributing ... funds," and

therefore "[f]or the Department to attempt to use an offset remedy ... would result in the failure of the school districts to provide Title I services during the year for which funding was withheld." *Id.* The court of appeals viewed this situation, in which intended beneficiaries suffer once when the state misapplies funds and again when the federal government withholds funds, as clearly contrary to congressional intent. *Id.* What this analysis assumes, we think erroneously, is that prospective withholding will result in reduced services. Prospective withholding does not cause a reduction in services—it is up to the state to decide whether to comply with the obligation not to reduce services or to commit a new breach of the funding conditions. Hence the reduction in services, if it occurs, is caused by the state's new breach rather than by the federal government's use of prospective withholding.

tained by the Board, and by the district court, and is therefore properly before us now.[12]

■ We hold that HHS has at all times had a statutory right of recovery that applies to Title XX funds misspent by a participating state, and, concomitantly, that Title XX has at all times provided that a state that misuses Title XX funds incurs a debt to the federal government for the amount misused. This conclusion follows straightforwardly from *Bell.* Here, as in *Bell,* the pre-amendment statute provides that the Secretary shall pay the state amounts to which it "will be *entitled*" for services yet to be performed, 42 U.S.C. § 1397a(b)(1) (1976) (emphasis added), while directing him to reduce the payment to take into account funds misspent by the state—but not directing him to reduce the state's obligation to perform those services that entitle it to payment. Here, as in *Bell,* the post-amendment statute makes explicit the state's obligation to "repay to the United States" misspent funds, while simultaneously giving the Secretary authority to withhold funds. 42 U.S.C. § 1397e(b) (1982). Here, as in *Bell,* the legislative history of the amendments contains no suggestion that Congress believed it was imposing a new or broader liability on the states. We conclude that Congress intended that states would be liable for misspent funds under the former Title XX grant-in-aid program.

## C.

Having established that HHS has a right to recover the Title XX funds Maryland misapplied, we now turn to the question of HHS's remedies. In this respect, too, the record reveals confusion on all sides. Once again, the confusion traces to HHS's failure to specify what funds it intends to withhold and its failure to explain the effect that prospective withholding would have on Maryland's obligation to fund its Title XX program. The audit report recommended that Maryland "make a financial adjustment to the Federal account of $207,-350." Audit Report at 17, J.A. at 22. Thereafter, the HHS Regional Administrator decided "to disallow a total of $207,350 of Federal Financial Participation (FFP) for the Title XX Training Program. These costs are applicable to Federal fiscal years 1977 ($99,579) and 1978 ($107,771)," and directed Maryland "to report the amount of this disallowance on line 10B of form SRS-0A41 for the quarter ending March 31, 1982." Crunk Letter, J.A. at 33. Neither the audit report nor the Regional Administrator's decision specify whether the disallowance was to be implemented by means of prospective withholding, retrospective withholding or repayment.

The Appeals Board noted that "[t]he Agency argued that how the Agency would recover the funds is not within the Board's jurisdiction and that the Board's inquiry should be limited to determining the validity of the disallowance." Board op. at 5, J.A. at 39. The Board "agree[d] with the Agency that the method of recovering disallowed funds is generally within the Agency's province," but said that "we have jurisdiction to examine any issues raised by the State's challenge to the disallowance," *id.,* J.A. at 39. This the Board did, but its discussion of remedies was directed solely to disposing of Maryland's claim that the issue of HHS's right to recover was moot

---

**12.** Maryland concedes that HHS has a right to recover misspent Title XX funds, *see* Brief for Appellants at 14 & n. 6, but it is not clear that this concession refers to a statutory rather than a common-law right. Rather than decide a dispositive issue on the basis of what might be a misconstruction on our part of the scope of Maryland's concession, we address the question whether HHS has a statutory right of recovery. This course seems especially appropriate in view of Maryland's argument that HHS can enforce its right of recovery (whether that is a statutory or common-law right) only by commencing a suit against Maryland. Since we are informed that HHS has no authority to bring suit, and that for that reason the United States was allowed to intervene before the district court, *see* Memorandum Order Granting Intervention, Record, tab 11, at 1, it is a fair inference that the right Maryland concedes is not created by the pre-amendment version of Title XX, which refers only to the federal agency and not to the United States.

because HHS had no available remedies. The Board concluded, quite properly, that the substantive issue was not moot because HHS *arguably* could recover in any of several ways (including suit to recover the funds and retroactive withholding). *See* Board op. at 6, J.A. at 40. The Board did not purport to reach or decide with finality which remedies were available to HHS: indeed, any such decision would have been quite odd, in view of the fact that the Board stated that "[t]he record does not show how the Agency proposes to recover the funds, should the Board sustain it on substantive grounds." *Id.*, J.A. at 40.

Thus, the Board's decision determined only that HHS has a right to recover the misspent funds, without determining how HHS should proceed to enforce that right. The Board did, of course, uphold the agency's issuance of a disallowance. But the disallowance itself, so far as we can discern, is little more than a formal notification to the state that it is indebted to HHS to the extent of the disallowance. As the Board said, "[t]he notification of disallowance had directed the State to report the amount of the disallowance on its quarterly statement of expenditures for the quarter ending March 31, 1982. However, the Agency later stated that it was not proposing to recover the disallowance through a reduction in the amount of future awards to the State under the Title XX block grant." Board op. at 4, J.A. at 38. Consequently, when the Board upheld the "disallowance" we do not think the Board was

conclusively adjudicating HHS's authority to recover the disallowance by any single means.[13]

This brings us to the district court's decision. The district court held that "administrative recovery by HHS was in this case both rational and proper," mem. op. at 8, J.A. at 54, thereby upholding what the court described as HHS's "claimed right of administrative set-off." *Id.* at 7, J.A. at 53. Thus, in the district court's view, when, "on October 25, 1982, HHS directed DHR to reduce Maryland's claims for federal financial participation (FFP) by $207,350," *id.* at 3, J.A. at 49, HHS was attempting "administrative recovery." [14]

The issue of "administrative recovery," however, was not properly before the district court unless that issue was presented by a final agency order. Both parties appear to have proceeded on the assumption that because the Board's decision became the Secretary's financial decision as to all issues before the Board, the Secretary's final decision is necessarily identical with the Board's decision. If that were true, it would follow that the requisite finality is lacking, for, as we have seen, the Board's decision did not conclusively decide that HHS could "recover" by any particular means.

 The question then becomes whether HHS's letter of October 25, 1982, directing Maryland to report the disallowance "on line 10B of form SRS–0A41 for the quarter ended September 30, 1982,"

**13.** HHS reads the Board's opinion differently. According to HHS, the Board held that HHS could recover the misspent funds administratively—that is, by withholding. *See* Brief for Appellees at 9; *see also* Defendants' Memorandum in Support of Defendants' Motion for a Judgment of Affirmance, Record, tab 17, at 2, 7, 8. HHS relies on the Board's statement, in its initial summary of its opinion, that "[w]e find that the Agency is not precluded from taking administrative action to disallow and recover these misspent funds." Board op. at 1, J.A. at 35. That statement is somewhat misleading, for while the Board clearly held that HHS had authority to *disallow* funds by administrative means, its discussion of "possible administrative actions" was confined to showing that the agency probably had some administrative remedies

available. That was the only showing the Board needed to make to reject Maryland's argument that the disallowance issue was moot because HHS had no administrative remedies. Thus, the Board suggested that HHS "certainly could offset this disallowance" against Title XX grant-in-aid funds, *id.* at 6, J.A. at 40, but said only that HHS "could arguably determine" that it had authority to withhold Title XX block grant funds to enforce this disallowance. *Id.*, J.A. at 40.

**14.** The district court appears to have believed that HHS would be made whole by this "setoff," and, for that reason, dismissed as moot the counterclaim of the United States as intervenor against Maryland.

Bradley Letter, J.A. at 46, is, as the district court apparently believed, a final determination by the agency to recover these misspent funds administratively. We think that it was. The finality inquiry is a pragmatic one, "focusing on whether judicial review at the time will disrupt the administrative process." *Bell*, 461 U.S. at 779, 103 S.Ct. at 2191 (citations omitted). *Bell* seems to imply that a mere demand for repayment by HHS would not be reviewable, because such a demand is merely a proposal as to one means of collection.[15] That suggests that what is central to the finality issue here is whether the agency "action" can be brought to completion unilaterally by the agency. That may not be true of a demand for repayment, but it is true of withholding, whether prospective or retroactive. Maryland has refused to comply with HHS's repayment direction—that is, has refused to file an amended form SRS–0A41 with HHS—but we have no reason to think that prevents HHS from withholding funds.

Nor do we see any reason why review at this time would disrupt the administrative process. It is unclear whether the Board even has jurisdiction to consider remedial issues, and in any event the Board declined to do so here. We think review under these circumstances is clearly not disruptive, and less burdensome to the parties than a remand to the Board to force it to resolve the jurisdictional dispute.[16] We turn, then, to the issue of administrative recovery as framed by the parties.

Maryland reads HHS's letter of October 25, 1982 as ordering "an adjustment against Maryland's current claims for federal financial participation." Brief for Appellants at 10. While conceding that judgment can be entered against it on the counterclaim of the United States (assuming that HHS correctly determined the amount to be repaid), Maryland strenuously maintains that *Bell* establishes that HHS cannot withhold Title XX block grant funds. Maryland contends that if HHS withholds block grant funds, Maryland will be entitled to reduce its block grant program by an offsetting amount. Since that reduction in Maryland's Title XX program would mean that program beneficiaries would be penalized, Maryland concludes that *Bell*

---

**15.** Several courts of appeals, relying on *Bell*, have upheld what those courts have characterized as final orders of the Secretary of Labor, directing state agencies or municipalities to repay misspent CETA funds out of their general revenues. *See, e.g., Mobile Consortium of CETA v. U.S. Dep't of Labor*, 745 F.2d 1416 (11th Cir. 1984); *California Tribal Chairman's Ass'n v. U.S. Dep't of Labor*, 730 F.2d 1289 (9th Cir.1984); *North Carolina Comm'n of Indian Affairs v. U.S. Dep't of Labor*, 725 F.2d 238 (4th Cir.1984); *Atlantic County v. U.S. Dep't of Labor*, 715 F.2d 834 (3d Cir.1983). None of these cases discusses the question left unresolved in *Bell*—under what circumstances an agency's demand for repayment constitutes a reviewable final order rather than simply a proposal of one means of collection. Even if those cases should be read as holding that a demand for repayment is a reviewable final order, that would lend additional support to our holding that in this case HHS's direction to Maryland to report the disallowance for withholding purposes constitutes a final order.

**16.** The regulation that created the Board provides, in general, that "[u]ntil the Board disposes of an appeal, the [Secretary] shall take no action to implement the final decision appeal-

ed." 45 C.F.R. § 16.22(a) (1984). But the regulation then goes on to provide that the Secretary may "implement a decision to disallow Federal financial participation claimed in expenditures reported on a statement of expenditures, by recovering, withholding or offsetting payments, if the decision is issued before the reported expenditures are included in the calculation of a subsequent grant," or "[t]ake other action to recover, withhold or offset funds if specifically authorized by statute or regulation." 45 C.F.R. § 16.22(b)(3)–(4). We express no opinion on the exact scope or import of this regulation, but it certainly could be read as denying the Board jurisdiction to review the "implementing" remedial actions that the Secretary may proceed to undertake while an appeal is pending before the Board. Some such argument would appear to underlie the Secretary's argument before the Board that "how the agency would recover the funds is not within the Board's jurisdiction." Board op. at 5, J.A. at 39. That dispute is apparently unresolved, for the Board responded that while the Board has ordinarily not directed how the agency should recover the funds, "[t]hat does not mean ... that the method used by the Agency to recover disallowances would be beyond Board scrutiny." *Id.* at 5 n. 5, J.A. at 39 n. 5.

precludes HHS from withholding block grant funds.

Whereas Maryland insists that HHS has decided to withhold Title XX block grant funds, counsel for HHS advises that because "Maryland has not, to date, complied with this repayment direction[,] ... it is uncertain from which federal funds the Secretary would deduct the misspent $207,-350." Brief for Appellees at 10 n. 6. The government's brief goes on to say that even if withholding is employed it is unclear whether it will apply to "certain preamendment Title XX funds not yet disbursed to Maryland," or to "Title XX block grant funds." *Id.* HHS also disagrees with Maryland over the availability of prospective withholding as a remedy here. HHS claims that "even an offset ... against Title XX block grant funds would be entirely lawful," *id.*, and argues that "administrative recovery cannot be barred because of a policy desire to avoid double-punishment of the intended beneficiaries of Title XX—once when the state improperly administered the funds, and a second time when the state must accept a diminution of currently-available funds. Congress plainly authorized, under Title XX, a right of administrative recovery by offset." *Id.* at 21 n. 8.

■ Both before and after amendment, Title XX has specifically authorized HHS to withhold funds, and drawn no distinction between prospective and retroactive withholding. Since Title XX is, at least in design, an advance-funded program, Congress may be presumed to have intended, at a minimum, to authorize prospective withholding. In addition, we see no reason to suppose—and Maryland has not asked us to hold—that Congress meant to terminate withholding authority if, due to administrative delay, withholding in fact would operate retroactively in a particular case. We therefore agree with HHS that Title XX authorizes both forms of withholding.

We are troubled, however, by HHS's apparent indifference to what might happen should Title XX block grant funds be withheld prospectively. As our analysis in Part IV–A establishes, prospective withholding is, as a remedy, legally equivalent to retroactive withholding: in each case, the federal government obtains a net recovery because it does not have to pay for services a state is obligated to provide. There is nonetheless a practical difference between these two forms of withholding, since in the case of retroactive withholding the state has already provided those services, whereas in the case of prospective withholding it has not. A second breach of the funding conditions by the state is therefore much more likely to occur where prospective withholding is employed—especially if the state is not clearly put on notice that its obligation to fund its service-provider program is not reduced by the federal government's use of prospective withholding. Thus, where a statute authorizes a federal agency to recover misspent funds by means of prospective withholding, all parties concerned, as well as the ultimate beneficiaries of the program, would benefit if the agency clearly explained the legal effects of withholding and the continuing nature of the state's obligation to fund that program.

In this case, given that HHS has a right of recovery and that HHS is authorized to employ prospective withholding as a remedy, it follows that if HHS in fact withholds funds prospectively Maryland will not be entitled to diminish its Title XX program in response. Had Maryland continued to act in the mistaken belief, which HHS has done nothing to dispel, that it could properly curtail its Title XX program, Maryland would in all likelihood have been led inadvertently to incur a new debt to the federal government, in the process depriving program beneficiaries of benefits Congress intended them to have. Surely that possibility is not one to which HHS should be indifferent, either when deciding how to proceed in recovering misspent funds or when notifying a state of the remedial actions HHS intends to take.

We do not, of course, by saying this imply that HHS is under a legal obligation to couple prospective withholding with no-

tice that the state may not respond by diminishing its Title XX program. It is far from clear that the withholding provisions of Title XX would impose any such duty on the Secretary, and in any event Maryland has never objected to HHS's final order on these grounds. These observations about what would seem sound administrative practice therefore do not affect our holding that HHS may recover by means of prospective as well as retroactive withholding.

Finally, we note that despite HHS's intimations in its brief that it may decide to withhold funds prospectively, and despite Maryland's claim that that is the necessary effect of compliance on Maryland's part with the October 25, 1982 letter from HHS, withholding block grant funds is *not, ipso facto*, equivalent to prospective withholding in this case. If, as seems certain, the block grant services for the quarter ending March 31, 1982 have already been rendered, then withholding of funds by HHS would in fact be retroactive because of administrative delay, although the Title XX block grant program seems intended to be advance-funded.[17]

If this surmise is correct, Maryland's argument reduces to this: a reduction in Title XX block grant funds payable for 1982 services, but actually paid at a later time, will operate like prospective withholding if the state is counting on those overdue 1982 funds to finance its 1984 or 1985 block grant program. Thus, Maryland maintains, without further explanation, that "a reduction in programs and services would necessarily follow an administrative reduction of $207,350 in Maryland's block grant funds." Brief for Appellants at 18. The answer to this argument follows from what

has already been said: just as the possibility of a new breach of the funding conditions by Maryland cannot defeat HHS's authority to withhold funds prospectively, so too Maryland's choice about how to finance its current operations cannot defeat HHS's authority to withhold funds retroactively. We therefore affirm the district court's holding that HHS may recover by withholding block grant funds ·as well as grant-in-aid funds, whether the withholding is actually prospective or retroactive.

### D.

Maryland's final claim is that HHS's administrative remedies are to be determined under Title XX as amended, and that Title XX as amended authorizes withholding only for overpayments of block grant funds. Since, Maryland argues, HHS is attempting to withhold funds on account of an overpayment of grant-in-aid funds under the old Title XX program, HHS has no authority to do what it is attempting here.

We shall assume, *arguendo*, that Maryland is correct in arguing that the withholding provision in Title XX as amended should apply retroactively.[18] The question then is whether Congress intended to extinguish HHS's authority to recover misspent grant-in-aid funds by means of withholding when Congress terminated the grant-in-aid program and established the new block grant program. We find this suggestion quite unpersuasive. While Congress made a major change in the funding mechanism for Title XX, its announced purpose did not shift, and many of the same services formerly provided through grant-in-aid funds are now supplied through block grant

---

17. HHS's initial disallowance letter, dated February 10, 1982, included an identical instruction to Maryland concerning its claims to funds for the quarter ending March 31, 1982. Crunk Letter, J.A. at 33–34. At the time of the letter, then, Maryland may not have provided the services to which the funds to be withheld related. That is an additional indication that HHS believes it can withhold funds prospectively, but there is no reason to think that Maryland has, even now, not provided the services for which it could claim reimbursement for that quarter.

18. *Bennett v. New Jersey* may indicate that Maryland's argument is incorrect and that the law to apply vis-a-vis HHS's remedies is presumptively "the law in effect when the grants were made." —— U.S. at ——, 105 S.Ct. at 1560 (footnote omitted); *see supra* note 6. Once again, however, we decline to decide whether the presumption announced in *Bennett* is controlling on the issue of remedies since such a decision would have no effect on the result we reach.

funds. Congress, we think, saw Title XX as continuing in revised form, rather than as repealed and replaced by a wholly new program. Maryland has pointed to nothing in the legislative history of the Title XX amendments that suggests that Congress intended to curtail HHS's authority to recover misspent pre-amendment funds. Indeed, the fact that the 1981 amendments made explicit the state's obligation to repay misspent funds is evidence to the contrary—for it is hard to believe that Congress simultaneously gave a windfall to old debtor states and imposed an altogether unequivocal liability on new debtor states. As the Appeals Board noted, state claims for the last quarter of 1981 under pre-amendment Title XX would not even have been filed by the effective date of the amendments. Board op. at 5, J.A. at 39. Hence if Maryland's interpretation were correct, HHS would have been unable, as a practical matter, to make any adjustments to funds claimed for that quarter. Under these circumstances the likelihood that the amending Congress intended to limit HHS's withholding authority to situations where the misspent funds were block grant funds seems infinitesimal.

■ Maryland sees the 1981 amendments as a repeal of pre-amendment Title XX, and argues that Congress thereby "extinguished any remedy which HHS had under that statute to obtain repayment of misspent Title XX funds by administrative setoff." Brief for Appellants at 14. The present case, however, involves a program whose purpose, and whose substantive scope (in terms of the services eligible for federal funding) were continued, while the method of funding was changed. Consequently, even if we were persuaded that the former Title XX was repealed rather than amended, the present case would come within the reasoning recently reiterated by the Supreme Court:

> Although there is a formal repeal of the old by the new statute, still there never has been a moment of time since the passage of the [old] act ... when these similar provisions have not been in force.

Notwithstanding, therefore, this formal repeal, it is ... entirely correct to say that the new act should be construed as a continuation of the old....

*County of Oneida v. Oneida Indian Nation,* —— U.S. ——, —— n. 18, 105 S.Ct. 1245, 1257 n. 18, 84 L.Ed.2d 169 (1985) (*quoting Bear Lake & River Water Works & Irrigation Co. v. Garland,* 164 U.S. 1, 11–12, 17 S.Ct. 7, 9–10, 41 L.Ed. 327 (1896)). Therefore, we construe Title XX as amended as authorizing HHS to withhold funds in order to recover funds misspent by a state under either the new block grant program or its grant-in-aid predecessor.

For the foregoing reasons, the judgment of the district court is

*Affirmed.*